J-S77031-18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ROHN RENNA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| PPL ELECTRIC UTILITIES, INC. | : | |
| | : | |
| Appellee | : | No. 2040 EDA 2018 |

Appeal from the Order Entered June 12, 2018
in the Court of Common Pleas of Northampton County
Civil Division at No(s): C-48-CV-2016-3551

BEFORE:  OTT, J., DUBOW, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.:               **FILED MARCH 22, 2019**

Rohn Renna appeals from the June 12, 2018 order entering judgment in favor of PPL Electric Utilities, Inc. (PPL).  Specifically, Renna challenges the grant of PPL's motion for summary judgment on his age harassment and retaliation claims pursuant to the Pennsylvania Human Relations Act (PHRA), 43 P.S. §§ 951-963.  We affirm the grant of summary judgment on Renna's age harassment claim, reverse the grant of summary judgment on Renna's retaliation claim, and remand for proceedings consistent with this memorandum.

We begin with a summary of the relevant facts in the record.  Renna began employment with PPL on June 10, 2013.  At the time Renna's employment with PPL ended in 2015, he was 61 years old.  PPL has a collective bargaining agreement (CBA) with the International Brotherhood of

_____

* Retired Senior Judge assigned to the Superior Court.

Electrical Workers Local 1600 (the Union).  Pursuant to the CBA, Renna had to undergo a six-month probationary period, after which he would become a member of the Union beginning on December 10, 2013.  Throughout his employment, PPL employed Renna as a facilities management worker, and Renna worked the second shift cleaning PPL's facilities along with his co-workers Nicholas Varec, Harry Von Oehsen, Al Rice, and Troy Bundy.[1]

**Renna's Relationship with Varec and Von Oehsen**

According to Renna, he initially got along with Varec and Von Oehsen, but the relationship soured around October 2013.  Renna Deposition at 49, 52-53.  Renna testified that Von Oehsen told him Renna was doing too much work and taking overtime away from Varec and Von Oehsen.  *Id.* at 53-54.  Renna believed this was the first incident that caused relations to deteriorate.  *Id.* at 53.

In his deposition, Renna testified that his direct supervisor, Joseph O'Rourke,[2] told him that Varec and Von Oehsen resented Renna because they were afraid he would surpass them in the line of job progression.

---

[1] At the time of their depositions in 2017, Rice testified that he was 68 and Bundy testified that he was 47.  PPL's Motion for Summary Judgment, 1/3/2018 (MSJ), at Exhibit 33 (N.T., 11/2/2017 (Rice Deposition), at 6); Renna's Brief in Opposition to MSJ, 3/9/2018 (Opposition Brief), at Exhibit 14 (numbering supplied) (N.T., 11/2/2017 (Bundy Deposition), at 38). Renna never offered evidence of the specific ages of Varec or Von Oehsen, and guessed that they were both in their twenties.  MSJ at Exhibit 5 (N.T., 9/7/2017 (Renna Deposition), at 49).

[2] O'Rourke was 37 years old at the time of his 2017 deposition.  MSJ at Exhibit 9 (N.T., 9/13/2017 (O'Rourke Deposition), at 44).

Renna Deposition at 54-57. In Renna's view, PPL management recognized Renna's "years and years of experience" and "good work ethics [*sic*]" and gave Renna preferable tasks like operating the plow truck while Varec and Von Oehsen shoveled snow. *Id.* Because of this, Varec and Von Oehsen "saw [Renna] as a threat, and [Renna] really believe[d] that that's what started everything." *Id.* at 54.

**Renna's November 2013 Complaint Regarding Varec**

On or around November 26, 2013, Renna complained to O'Rourke that Varec was sabotaging his work. *Id.* at 60-67. Specifically, Renna complained that Varec frequently harassed him by throwing M&M candies on the floor after Renna had cleaned, placing trash and empty boxes on Renna's cart, and wrapping the cord to Renna's vacuum cleaner around furniture. *Id.* Renna acknowledged to O'Rourke that he had never personally witnessed Varec doing these things, but nevertheless strongly believed that it was Varec.[3] Renna Deposition at 60-67. Renna does not recall whether he mentioned anything regarding his age to O'Rourke, and the complaint form completed by O'Rourke does not reference anything regarding Varec's conduct being motivated by age.[4] Renna Deposition at 65, 69; MSJ, Exhibit 11 (Confidential Complaint Form, 11/26/2013). In fact, Renna

---

[3] O'Rourke questioned Varec about the M&Ms, but Varec denied that it was he who threw them on the floor. O'Rourke Deposition at 39.

[4] O'Rourke testified that Renna never mentioned a belief that the conduct was motivated by his age. O'Rourke Deposition at 97.

acknowledged that "[a]t that time, what [he] was being harassed about had nothing to do with [age]" and "[t]hey were just trying to get [him] fired" before the end of his probationary period because "[he] made them look bad." Renna Deposition at 65.

Renna contends he made other complaints to O'Rourke, including his belief that Varec was tampering with his work station, throwing papers on the floor in his work area, and spilling coffee in the areas Renna had cleaned. *Id.* at 71-72. Renna did not recall when he specifically complained, but claimed he texted O'Rourke almost every day with a complaint. He stated, "I complained in texts almost on a daily basis. That's how bad the harassment was. So I don't remember the days and when and how. I talked to him on a daily basis with problems with these people."[5] *Id.* at 68.

**PPL's Response to Renna's November 2013 Complaint**

Following Renna's late-November complaint to O'Rourke, O'Rourke informed Frank Grabowski, the vice president of the Union, that his "union brothers" were not getting along. O'Rourke Deposition at 43. On December 19, 2013, O'Rourke and Grabowski met with another Union member, Renna, Renna's co-worker Bundy, and the alleged perpetrators Varec and Von

---

[5] Neither party attached any text messages to the summary judgment pleadings or questioned O'Rourke specifically about the text messages.

Oehsen. Renna Deposition at 67, 71. Renna recalled that Grabowski told the employees they had to get along. *Id.* at 71.

The following day, Renna told O'Rourke someone had thrown trash in Renna's cart, and Renna suspected Varec did it. O'Rourke Deposition at 47; Renna Deposition at 68; MSJ at Exhibit 10 (Handwritten Notes of O'Rourke).

On December 23, 2013, O'Rourke emailed Harry Scouras, a representative in PPL's human resources (HR) department, telling him that he had to send Renna home on December 20, 2013, because Renna was "very distraught" regarding Varec. MSJ at Exhibit 12 (12/23/2013 Email). O'Rourke wrote that "Varec has been harassing [Renna] and doing things to his supplies [] ever since we had our meeting with [the Union]," "[he] was concerned for [Renna's] work environment," and he needed to know how to handle the situation. *Id.* On December 24, 2013, O'Rourke wrote in his notes that "[Renna] grows increasingly fed up with [Varec and Von Oehsen] not pulling their end of things. He states he feels like he is in a hostile work force!" Handwritten Notes of O'Rourke; O'Rourke Deposition at 49-50. On December 25, 2013, O'Rourke wrote in his notes that Renna called him to tell him that he had "words" with Varec, and Renna wanted "HR involvement" and "harassment filed on" Varec and Von Oehsen, but O'Rourke's opinion was that there was "no solid proof." Handwritten Notes of O'Rourke.

Nevertheless, at some point in response to Renna's escalating complaints, O'Rourke re-assigned Varec, Von Oehsen, and Bundy to different floors to separate them from Renna. O'Rourke Deposition at 15-16. Furthermore, two HR representatives, Scouras and Sara Sorenson, conducted an investigation of Renna's complaints in early February 2014. *See* MSJ at Exhibit 14 (Notes from HR interview of Renna), Exhibit 15 (Notes from HR Interview of O'Rourke, Varec, Von Oehsen, Bundy, and Rice), and Exhibit 16 (Summary of HR Investigation).

During Renna's interview, he told Scouras and Sorensen about several "pranks" he attributed to Varec and Renna's belief that Renna made Varec look bad. Renna Deposition at 104-05; Notes from HR Interview of Renna (stating that "[Renna] feels that he was making [Varec] look bad because [Renna] was doing a good job and [Varec wasn't. Renna] is the new guy and seems like he's the butt of things. [Renna said] 'I can take some type of harassment but not this repeated harassment.'").

During their interviews, O'Rourke, Bundy, and Rice told HR that they had not personally witnessed Varec performing the acts that Renna was alleging, although O'Rourke and Bundy believed it was Varec because he had performed a similar act against Von Oehsen by throwing away his cleaning supplies. MSJ at Exhibit 16 (HR Report from Investigation of Renna's 11/2013 Complaint). They sensed Varec did not like Renna because of

Renna's strong work ethic. *Id.* During his interview, Varec denied performing the acts. *Id.*

During Bundy's interview, Scouras and Sorensen learned that in December 2013, Varec had made a statement about Renna to Bundy. Specifically, Bundy reported that Varec told him he was "going to start working on [Renna]" and that he would "send someone to [Renna's] house." MSJ at Exhibit 7 (N.T., 9/13/2017 (Scouras Deposition), at 29); Notes from HR Interview of Bundy. Sometime after the HR interviews, Bundy told Renna about Varec's statement. Renna Deposition at 87-89. Renna interpreted the statement as a death threat.[6] *Id.* at 217.

At the conclusion of the HR investigation, PPL determined Varec made comments to Bundy, including "I am going to start working on [Renna]," "I'm going to send someone to [Renna's] house," "[Bundy] and [Renna] make a cute couple," and "[Bundy] forgot his tail (referring to [Renna]," and such comments created "a hostile working environment … in violation of the PPL Standards of Integrity…." HR Report from Investigation of Renna's 11/2013 Complaint. Accordingly, on March 18, 2014, O'Rourke issued Varec a written warning pursuant to PPL's Responsible Behavior Program. MSJ at Exhibit 17 (Written Warning to Varec). The warning indicated that his behavior would be monitored for 12 months and any additional problems

---

[6] Bundy, on the other hand, interpreted the statement as "locker room talk" and testified that he felt Varec was just trying to "fluff himself up." Bundy Deposition at 23.

could result in further discipline, up to and including termination of employment. *Id.* Ultimately, Varec resigned from employment at PPL on April 24, 2014. MSJ at Exhibit 18 (Varec Resignation Letter).

**Renna's Transfer Requests**

In February and March 2014, Renna repeatedly requested a transfer to PPL's facility at the Martin Creek Plant or the Pocono Service Center. Renna Deposition at 91-92, 235-46; MSJ at Exhibits 19 (3/13/2014 Email Chain), 20 (3/24/2014 Email Chain). In one of his emails requesting a transfer, Renna told Scouras in HR that he did not feel safe in the work environment, he believed he was the target of harassment by Varec and Miguel Aponte,[7] and that he "should not be forced to work in such a hostile environment." 3/13/2014 Email Chain. Scouras told him he has been meeting with management to discuss Renna's "situation" and asked him to "hang in there a little bit longer." *Id.* Scouras requested that Grabowski, the vice president of the Union, inform Renna where the CBA would permit Renna to transfer. Scouras Deposition at 24-25. Grabowski told Renna that he could not transfer to the locations he requested because it was not in his line of progression under the CBA, but provided the names of four locations where Renna could transfer. 3/24/2014 Email Chain. Renna declined to transfer to

---

[7] Aponte was not an employee of PPL; he was a security guard who was assigned to the facility where Renna worked. Renna Deposition at 135-36. Because we hold *infra* that Renna has waived any claims with respect to Aponte, there is no need to describe Renna's complaints against Aponte.

those locations, citing concerns that he would not be safe there because they were closer to Varec's home.[8]  Renna Deposition at 91-92, 235-46.

**Renna's January 2015 Complaint about Von Oehsen**

On January 6, 2015, Renna complained to Jeffrey Pizzuto, his direct supervisor at the time, that Von Oehsen had tampered with his work supplies by pulling out his data cable.  MSJ at Exhibit 24 (1/6/2015 Email Chain).  He acknowledged that he did not know it was Von Oehsen for sure, but believed it was he because "there is no one who comes in here."  *Id.*  He again stated it was a hostile environment, but did not reference anything regarding age.  *Id.*  The following day, Pizzuto wrote an email to himself with notes of a conversation he had with Renna, wherein Renna told him that he had hired a lawyer, would not attend a meeting with Pizzuto, Von Oehsen, and the Union about his complaints, and instructed Pizzuto to contact his lawyer.  Opposition Brief at Unnumbered Exhibit (1/7/2015 Email).

**PPL's Response to Renna's January 2015 Complaint**

On January 12, 2015, Linda Greenwald, who worked in PPL's HR department, interviewed Renna about his complaint.  MSJ at Exhibits 26 (Greenwald Handwritten Interview Notes), 27 (Greenwald Typed Interview Notes).  Renna told her that he had been harassed for 18 months and

---

[8] Renna testified that he continued to harbor fear of Varec after Varec resigned from PPL.  *Id.*

management did nothing about it. *Id.* He maintained that Varec and Von Oehsen bullied, harassed, and provoked him, which stemmed from Renna's wanting to do his job and move up in the company, and Renna receiving a floor assignment they wanted. *Id.*

Renna informed Greenwald that he believed that Von Oehsen continued to harass him by placing M&Ms on the floor Renna was assigned to clean, leaving a sign to not place boxes on a table in Renna's area despite boxes normally being placed there, clogging a burner machine on the second floor, and unplugging Renna's mouse, keyboard, and data cable.[9] *Id.* Renna also believed that Von Oehsen was stalking him because Von Oehsen showed up in the same break areas while Renna was on break and kept track of Renna's days off on his calendar. *Id.* Finally, Renna accused Von Oehsen of recording him and taking pictures of him while he was on break. *Id.*; Renna Deposition at 183. Renna does not remember whether he told Greenwald that he was being harassed due to his age. *Id.* at 184. Greenwald's notes do not reference anything regarding age. Greenwald Handwritten Interview Notes; Greenwald Typed Interview Notes.

According to Greenwald's notes, two days later, Greenwald told Renna that Von Oehsen agreed to remain on a separate floor from Renna except for using the cafeteria during lunch time, with the goal of decreasing their

---

[9] The latter two incidents occurred around January 5, 2015. *Id.* The record does not reveal the dates of the other incidents.

encounters with each other. *Id.* During the meeting, Renna told Greenwald that he was going to snap one day. *Id.*; Renna Deposition at 181. Greenwald responded by telling Renna that he would be responsible for his own actions if he chose to take it upon himself to solve the problem, that he should use the employee assistance program to help him cope with frustrations, and he should call his supervisor or security if he felt a situation was getting out of hand. Greenwald Typed Interview Notes.

**Renna's EEOC Charge**

On February 5, 2015, Renna filed a charge alleging, *inter alia*, age harassment and retaliation with the Equal Employment Opportunity Commission (EEOC).[10] The charge was dual-filed with the Pennsylvania Human Relations Commission (PHRC).

**PPL's Discipline of Renna and Renna's Cessation of Employment**

On March 10, 2015, according to an email Pizzuto sent to himself, Renna called him and was upset because he had learned Von Oehsen complained to the Union that Renna was harassing him.[11] Opposition Brief at Unnumbered Exhibit (3/10/2015 Email). Renna told Pizzuto "[he] had

---

[10] Ultimately, on July 27, 2017, the EEOC notified Renna that based upon its investigation, it was unable to conclude that the information established a violation of the statutes the EEOC enforced. Accordingly, it issued Renna a right-to-sue letter.

[11] In a February 11, 2015 email, Von Oehsen complained to Pizzuto and Grabowski that Renna put up wet floor signs to block his path purposely the previous night. Opposition Brief at Unnumbered Exhibit (2/11/2015 Email).

enough of this shit," "HR is doing nothing about it," his "blood pressure is high," and he's "going to beat the shit out of [Von Oehsen]." 3/10/2015 Email. Further, Renna came to Pizzuto's office in person to tell him that he has been talking to his lawyer, he needed documentation of the times he has complained, he was "done with this shit," he was "going to beat [Von Oehsen], and [he doesn't] care if [he gets] fired." *Id.*

During his deposition, Renna denied that he had told Pizzuto that he was going to "beat [Von Oehsen] up." Renna Deposition at 210. Instead, Renna claimed that he was really upset that Von Oehsen was "trying to start a fight" after they had not spoken in the last three or four months, and he told Pizzuto he was "tired of this shit" and PPL had to do something before he "snap[ped]." *Id.* at 210-16.

On March 12, 2015, Pizzuto issued a notice to Renna that PPL was disciplining him for his alleged comments threatening bodily harm to Von Oehsen. MSJ at Exhibit 28 (Disciplinary Notice). The notice informed Renna that PPL was placing him in the "Responsible Behavior Program at the Decision Making Leave level." *Id.* PPL required Renna to serve one day on "Decision Making Leave" and to remain in the "Responsible Behavior Program" for 24 months. *Id.* It informed him it considered his comments to be a threat towards Von Oehsen in direct violation of PPL's code of conduct, and cautioned him that further violations could result in discipline up to and including termination of employment. *Id.*

Upon receiving notice of the discipline from Pizzuto, Renna raised his voice, told Pizzuto his discipline was "bullshit," and left PPL with the escort of security guards. Renna Deposition at 229-30. Renna believed he was treated unfairly as compared to the discipline issued to Varec, and he "snapped" and "had to go to the doctor because [his] blood pressure was ready to give [him] a heart attack." *Id.* at 222-23. He also believed that PPL was retaliating against him for filing an EEOC complaint. *Id.* at 224-25.

Renna never returned to work after March 12, 2015 and went on a six-month short-term disability leave.[12] *Id.* at 247. He filed an unsuccessful grievance pursuant to the CBA regarding the discipline. *Id.* at 230-32. Sometime after Renna left his employment at PPL, PPL terminated the employment of Von Oehsen for unrelated reasons.

**Renna's PHRA Complaint**

On April 29, 2016, Renna filed a two-count complaint against PPL in the Court of Common Pleas of Northhampton County, alleging a hostile environment based upon age,[13] and retaliation based upon protected activity, all in violation of the PHRA. PPL filed an answer, and the case proceeded to discovery.

---

[12] Renna's claim for long-term disability was denied, as was his claim for workers' compensation. *Id.* at 247-68. He appealed the denial of his workers' compensation claim but settled it while the appeal was pending. *Id.*

[13] The complaint also alleged a hostile environment based upon race, but Renna later withdrew this claim.

- 13 -

When asked during his deposition if Varec or Von Oehsen ever made comments to him about his age, Renna responded, "[i]t was – it kinda was and wasn't. Oh you're just too old, or something like that." *Id.* at 60. The comment occurred when Renna did not understand what the commenter was doing regarding a phone, and the commenter said, "[o]h, you're just too old." *Id.* at 61. Renna does not "remember exactly who it was" who made the comment; he "think[s]" it was Von Oehsen but "[i]t may have been [Varec]." *Id.* Renna does not remember when the comment was made, but he thinks he was still on probation. *Id.* When asked if he ever reported the comment to anyone in management at PPL, he responded, "I don't know. I don't think I did." *Id.* Renna wanted to keep a "low profile" during his probation and not lose his job. *Id.* Later, Renna specified that he did not think he reported the comment during his probationary period, but he "may have" reported it later. *Id.* at 62. He admitted he does not recall one way or another. *Id.*

Renna does recall reporting a comment made by Varec and Von Oehsen about Rice's age. Renna told O'Rourke that Varec and Von Oehsen said regarding Rice that "the guy is old. He should retire." *Id.* at 75. They also said Rice was holding them up from advancing. *Id.* at 77. Renna also recalled that Varec and Von Oehsen asked Renna why Renna was working because he was "almost at retirement age" and it was "time that [he] retire too." *Id.* at 76. Renna was less sure about whether he reported the

comment about himself to O'Rourke, stating "I did say one thing to [O'Rourke] at least about [Rice]. Maybe it might not have been about me. It probably was." *Id.* at 75. Renna does not remember when he talked to O'Rourke, but estimated that it was right before Varec left employment. *Id.* at 76.

Renna stated that he never discussed the comment with anyone in PPL's HR department. *Id.* at 77. However, Renna believes PPL was aware that he was being subject to age harassment because of his attorney's letter to PPL's counsel. *Id.* at 202. He also thinks he "made it very clear to [O'Rourke] many times that since [he is] older, [his] work ethics are different than these younger guys and they hold that against [him]." *Id.* at 99.

Following the close of discovery, PPL moved for summary judgment on both of Renna's claims. Renna filed a reply, and each party filed briefs following oral argument. On June 12, 2018, the trial court granted PPL's motion for summary judgment.

**Issues on Appeal and Standard of Review**

This timely-filed appeal followed.[14] Renna raises two issues[15] on appeal: whether the trial court erred in holding that PPL was entitled to

---

[14] Renna and the trial court complied with Pa.R.A.P. 1925.

[15] Renna also purports to raise a third issue: whether the trial court erred in granting summary judgment to PPL on Renna's disparate treatment claim. *(Footnote Continued Next Page)*

- 15 -

summary judgment on (1) Renna's claim that he was subjected to a hostile work environment based upon his age and (2) Renna's claim that he was retaliated against for engaging in protected activity. Renna's Brief at 4.

We consider Renna's issues mindful of the following.[16]

> Our standard of review on an appeal from the grant of a motion for summary judgment is well-settled. A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

_(Footnote Continued)_ ───────────

Renna's Brief at 4. A claim for disparate treatment is a discrimination claim focused on adverse employment actions that is distinct from a discrimination claim based upon a hostile environment. **See, e.g., Ford-Greene v. NHS, Inc.**, 106 F. Supp. 3d 590 (E.D. Pa. 2015). Although Renna occasionally uses the term "disparate treatment" in his complaint and his brief, Renna's complaint does not plead a claim for disparate treatment. **See** Trial Court Opinion, 6/12/2018, at 31 (finding the same). Furthermore, Renna makes no attempt to argue or analyze the legal standards for a disparate treatment claim in his brief. To the extent Renna is attempting to argue in his brief that PPL disciplined Renna more harshly than Varec based upon Renna's age, **see** Renna's Brief at 28-30, and that treatment constituted disparate treatment based upon his age, such a claim is waived for failure to develop it. **See McEwing v. Lititz Mut. Ins. Co.**, 77 A.3d 639, 647 (Pa. Super. 2013) ("Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

[16] The PHRA's age discrimination and retaliation protections are substantially similar to those in the federal Age Discrimination in Employment Act (ADEA). **Fogleman v. Mercy Hosp., Inc.**, 283 F.3d 561, 567 (3d Cir. 2002); **Fasold v. Justice**, 409 F.3d 178, 183 (3d Cir. 2005). In general, we analyze PHRA claims by using the same standards as analogous federal statutes. **Ferraro v. Temple Univ.**, 185 A.3d 396, 402 n.3 (Pa. Super. 2018). Further, we may look to federal court decisions to inform our interpretations of the PHRA, although such decisions are not binding on our Court. **Kroptavich v. Pa Power & Light Co.**, 795 A.2d 1048, 1055 (Pa. Super. 2002).

***Krauss v. Trane U.S. Inc.***, 104 A.3d 556, 562-63 (Pa. Super. 2014)

(citations omitted).

> We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered.
>
> Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of [its] cause of action. Summary judgment is proper if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury. Thus, a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the jury.

***H & R Block E. Tax Servs., Inc. v. Zarilla***, 69 A.3d 246, 248–49 (Pa. Super. 2013) (citations omitted); ***see also*** Pa.R.Civ.P. 1035.2.

## Renna's Hostile Work Environment Claim Based Upon Age

Regarding Renna's hostile environment claim, the PHRA provides that

[i]t shall be an unlawful discriminatory practice, unless based upon a *bona fide* occupational qualification ...

> (a) For any employer because of the ... age ... of any individual ... to otherwise discriminate against such individual ... with respect to compensation, hire, tenure, terms, conditions or privileges of employment ..., if the individual ... is the best able and most competent to perform the services required.

43 P.S. § 955(a). "The term 'age' includes any person forty years of age or older…." 43 P.S. § 954(h). One form of discrimination is a hostile work environment, which is a cognizable claim under the PHRA. **Dreshman v. Henry Clay Villa**, 733 F. Supp. 2d 597, 611 (W.D. Pa. 2010).

To prevail on a hostile work environment claim under the PHRA, a plaintiff must show: (1) he suffered intentional discrimination because of his age; (2) the harassment was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in that position; and (5) the existence of *respondeat superior* liability. **Hoy v. Angelone**, 691 A.2d 476, 480 (Pa. Super. 1997).

In the instant case, the trial court ruled in Renna's favor by determining that there was a dispute of material fact regarding the first four prongs. Trial Court Opinion, 6/12/2018, at 14-17. It is the last prong that is at issue in this appeal. "The basis of an employer's liability for hostile environment [age] harassment depends on whether the harasser is the victim's supervisor or merely a coworker." **Huston v. Procter & Gamble Paper Products Corp.**, 568 F.3d 100, 104 (3d Cir. 2009). In the present case, Renna does not contend that the employees who performed the

alleged harassing incidents were supervisors; all were merely co-worker facilities management workers.[17]

As the United States Court of Appeals for the Third Circuit has explained,

> [w]hen the hostile work environment is created by a victim's non-supervisory coworkers, the employer is not automatically liable. Rather, employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action. That is, an employer may be directly liable for non-supervisory co-worker [age] harassment only if the employer was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment.

*Huston*, 568 F.3d at 104.

Here, Renna does not argue that PPL failed to provide a reasonable avenue for complaint. Instead, he contends that PPL knew or should have known of harassment through his complaints to his supervisors, O'Rourke

---

[17] Renna also contends that Aponte, who was not an employee of PPL, harassed him. We hold that Renna has waived any claims with respect to Aponte. Although Renna mentions Aponte a few times in passing in his brief, he fails to develop any claims with respect to Aponte. For example, he fails to point to any evidence in the record supporting a claim that any complaints about Aponte put PPL on notice that Aponte was harassing Renna because of his age. He also fails to discuss the standards for holding an employer liable for the conduct of non-employees. Thus, Renna's claim with respect to Aponte is waived. *See* Pa.R.A.P. 2119(a); *see also McEwing*, 77 A.3d at 647.

- 19 -

and Pizzuto, and to Scouras and Greenwald in HR.[18]  Renna's Brief at 30-36.
Further, he complains that PPL failed to take prompt and appropriate
remedial action.  *Id.*

Accordingly, for PPL to be liable under the theory pursued by Renna,
he needed to establish two things: first, that he had "provided management
level[-]personnel with enough information to raise a probability of [age]
harassment in the mind of a reasonable employer."  *Huston*, 568 F.3d at
105.  Second, he must show that the action was not reasonably calculated to
prevent further harassment.  *See Knabe v. Boury Corp.*, 114 F.3d 407,
412 (3d Cir. 1997) ("The law does not require that investigations into [age]
harassment complaints be perfect.  Rather, to determine whether the
remedial action was adequate, we must consider whether the action was
reasonably calculated to prevent further harassment.").  If the remedy
chosen by the employer is "adequate," an employee "cannot dictate that the
employer select a certain remedial action."  *Id.* at 414.  Furthermore,
punitive action against a harassing employee "is not necessary to insulate
the employer from liability."  *Id.* at 414.

In the instant case, the trial court determined that Renna failed to
establish that PPL knew or should have known about any age-based

---

[18] "An employer may also have constructive notice of harassment if the harassment is so pervasive and open that a reasonable employer would have had to be aware of it[.]"  *Huston*, 568 F.3d at 105 (internal citations and quotation marks omitted).  However, Renna does not argue this theory.

harassment. Trial Court Opinion, 6/12/2018, at 18. According to the trial court, the record evidence shows that Renna never complained to his supervisors or PPL's HR team that he was being harassed because of age, and the complaints that he did make did not raise a probability of age-based harassment. *Id.* at 19. The trial court rejected Renna's argument that his own subjective correlation between work ethic and age was enough to put PPL on constructive notice that Renna was being harassed because of his age. *Id.* at 19-20.

Renna argues that because there was a significant age disparity between Renna and his alleged harassers, and because Renna continually complained of ongoing conduct that was "despicable," PPL had enough information to place it on constructive notice that age harassment was occurring. Renna's Brief at 17, 20, 25. He also emphasizes Renna's testimony that he complained to O'Rourke regarding an alleged age-based comment. *Id.* at 10. PPL, on the other hand, argues that the conduct Renna complained about was facially neutral and "garden-variety immature behavior" insufficient to reflect an "age-based animus." PPL's Brief at 16.

The issue of whether PPL had constructive notice of Renna's age harassment is a close call. Anti-discrimination statutes do not prohibit all verbal or physical harassment in the workplace, only harassment that constitutes discrimination **because of** specified protected classifications. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80

(1998). Further, Renna's complaints often attributed a non-age related motive to the alleged harassers' conduct, namely resentment that Renna worked hard, which in turn garnered Renna preferential assignments, exposed the other employees' lackluster work, and stood in the way of other employees' advancement. Renna also was non-specific and hedged on whether he ever expressly referred to his age when making his complaints, and none of PPL's documentation of his complaints reflects a reference to age.

Conversely, there is no dispute that there is a large age disparity between Renna and the alleged harassers and Renna continually complained using terms such as harassment and hostile work environment. While the trial court is correct that Renna's correlation between his work ethic and age was subjective, Renna claims that he relayed his subjective correlation to O'Rourke when complaining about the harassment. **See** Deposition of Renna at 99-101. In this Commonwealth, "summary judgment may be entered only in those cases which are clear and free from doubt." **Schweitzer v. Rockwell Int'l**., 586 A.2d 383, 386 (Pa. Super. 1990). While Renna may not ultimately prevail at trial, at this stage, when viewing the record in the light most favorable to Renna as the non-moving party, there is still a dispute of material fact as to whether PPL was on notice of any alleged age-based harassment of Renna by his co-workers. Therefore, we hold the trial court erred in determining otherwise.

Next, the trial court held that to the extent that PPL knew about harassment generally, Renna produced no evidence to suggest that PPL failed to take prompt and remedial action to address the harassment.

> Rather, the record indicates that [Renna's] supervisors consistently addressed his complaints and initiated multiple [HR] investigations in response. In addition, [PPL] formally disciplined Varec when necessary, reassigned Varec and Van Oehsen to a different floor to separate them from [Renna], and ensured that [Renna] was not assigned to Aponte's area after their argument involving the "wet floor" sign.

Trial Court Opinion, 6/12/2018, at 20. The trial court concluded that these actions demonstrated that PPL took steps reasonably calculated to stop the harassment, and Renna failed to introduce any evidence to the contrary, warranting summary judgment in PPL's favor on Renna's hostile work environment claim. *Id.* at 20-21.

Renna complains that PPL did not act promptly to resolve the problems, and PPL's actions were not reasonably calculated to address the harassment. Renna's Brief at 32-36. Renna argues that even though PPL warned Varec and Von Oehsen to stay on their assigned floors in response to Renna's complaints, the fact that incidents continued to occur demonstrates that PPL "did nothing to enforce any resolution to the ongoing problem." *Id.* at 32.

A close look at the record, however, reveals that PPL did take prompt action in a manner reasonably calculated to stop any alleged harassment each time Renna raised concerns. Renna's November 2013 complaint

accused Varec of misbehavior, but no one saw who engaged in the behavior. Thus, it was reasonable for PPL to investigate the complaint more thoroughly. PPL reached out to the Union to alert them about the problem and set up a meeting to discuss workplace relations, albeit inadvertently provoking another response from the alleged harasser. However, PPL instructed employees to stay on their respective floors and offered Renna the opportunity to transfer to four locations in his Union progression line. Once PPL learned about Varec's comments during its investigation, it issued Varec a written warning pursuant to PPL's Responsible Behavior Program. Renna does not point to any actions by Varec after PPL issued the written warning. Furthermore, Varec resigned thereafter, obviously ending any harassment by him.

The record does not reveal any reports of harassment by Renna regarding PPL employees between Varec's discipline in March 2014 and Renna's complaint regarding Von Oehsen in January 2015. After Renna complained in January 2015, PPL once again was faced with a situation where no one saw the culprit engage in the alleged acts. It promptly instituted an HR investigation, which resulted in PPL's instructing Von Oehsen to avoid Renna's floor except to go to the cafeteria and PPL's advising Renna of how to complain if he faced further problems. Even if an employer does not reprimand an employee, a remedial action may still be "adequate as a matter of law [if] it was reasonably calculated to prevent

further harassment." **Knabe**, 114 F.3d at 413 (holding that an employer's response was adequate to prevent liability where as a result of two meetings, the alleged harasser "was made aware of his responsibilities, and Knabe was made aware of her rights in case of future improper conduct"). Renna even acknowledged that after PPL spoke to Von Oehsen, several months passed without any run-ins between them. Deposition of Renna at 210-16. Under the facts in this record, we hold that PPL's actions were adequate as a matter of law because they were reasonably calculated to prevent further harassment. Accordingly, the trial court did not err by holding that Renna cannot establish the *respondent superior* prong of his hostile work environment claim, and thereby granting summary judgment in favor of PPL.

**Renna's Claim of Retaliation Based upon Protected Activity**

We turn now to Renna's second issue regarding his claim of retaliation. The PHRA forbids an employer from "discriminat[ing] in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." 43 P.S. § 955(d).

> A *prima facie* case of retaliation [under the PHRA] requires a complainant to show that: (i) []he was engaged in a protected activity; (ii) [his] employer was aware of the protected activity; (iii) subsequent to participation in the protected activity, complainant was subjected to an adverse employment action;

and (iv) there is a causal connection between participation in the protected activity and the adverse employment action.

*Ferraro*, 185 A.3d at 405.

To analyze Renna's claim, we must first determine whether Renna engaged in protected activity. "For purposes of the first prong of a *prima facie* case of retaliation, protected opposition activity includes not only an employee's filing of formal charges of discrimination against an employer but also informal protests of discriminatory employment practices, including making complaints to management." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193–94 (3d Cir. 2015) (citation and quotation marks omitted). It is axiomatic that the protected activity must relate to employment discrimination forbidden by the statute. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 792 n.10 (3d Cir. 2016). A plaintiff in a retaliation case "need not prove the merits of the underlying discrimination complaint," but he must have acted in good faith with an objectively reasonable belief that the activity he opposed constituted unlawful discrimination under the PHRA. *Daniels*, 776 F.3d at 193–94 (citation and quotation marks omitted).

On appeal, Renna argues the letters sent by his attorney to PPL's counsel constitute protected activity, as well as the filing of the EEOC charge on February 15, 2015. Renna's Brief at 37-38. On October 28, 2014, Renna's counsel sent a letter to a lawyer he believed represented PPL. On November 5, 2014, he sent a letter with the same wording to PPL's in-house counsel. The letters did not mention anything about Renna's belief that he

was being harassed because of his age. MSJ at Exhibit 32 (10/28/2014 & 11/5/2014 Letters). The letter stated that Varec had threatened Renna's life, and Aponte, who was friends with Varec, was continuing to harass Renna while he was at work. PPL's in-house counsel responded to the initial letter on November 4, 2014, and informed Renna's counsel that Varec had resigned from the company seven months prior and Aponte was no longer assigned to Renna's location. Opposition Brief at Unnumbered Exhibit (11/4/2014 Letter).

While a letter by counsel may constitute protected activity in some circumstances, in this matter, the letters complained about treatment of Renna in general and do not mention or implicate age harassment. *See* 10/28/2014, 11/5/2014 Letters; *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) ("A general complaint of unfair treatment does not translate into a charge of illegal age discrimination."). Therefore, the letters do not constitute protected activity.[19] The filing of his EEOC charge on February 15, 2015, on the other hand, is "undisputedly a protected

---

[19] The trial court held that Renna's internal complaints to his supervisors did not constitute protected activity since the court had already determined that Renna did not complain of age discrimination. Trial Court Opinion, 6/12/2018, at 26. Although we concluded *supra* that there is a dispute of material fact as to whether Renna complained about age discrimination, this holding does not affect Renna's retaliation claim because Renna does not argue in his brief that any of his complaints to management or HR constituted protected activity. Therefore, we shall focus solely on the filing of his EEOC charge. *See Commonwealth v. Knox*, 50 A.3d 732, 748 (Pa. Super. 2012) (noting this Court is not obliged or equipped to develop an argument for a party).

activity." Trial Court Opinion, 6/12/2018, at 26 (citing **Collins v. Kimberly-Clark Pa., LLC**, 247 F. Supp. 3d 571, 598 (E.D. Pa. 2017)).

Thus, we move on to the second prong of the *prima facie* case, which is whether PPL was aware that Renna filed an EEOC charge. Greenwald does not recall when she learned about the EEOC charge except that it was after she met with Renna in January 2015. MSJ at Exhibit 25 (N.T., 11/25/17 (Greenwald Deposition), at 19-20). In an affidavit, Pizzuto swore that he did not know of the EEOC charge until sometime after March 12, 2015, when he disciplined Renna as discussed *infra*. MSJ at Exhibit 30 (Pizzuto Affidavit, 1/2/2018, at ¶ 5). However, the record contains a February 25, 2015 email from Renna to Pizzuto informing him of the EEOC charge, and Pizzuto forwarded the email to Greenwald and someone named Janel Melnick a minute after receiving it. Opposition Brief at Unnumbered Exhibit (2/25/2015 Email Chain) (stating Renna's belief that he had been "a victim of harassment for two years," he would have resigned already if it was not for his financial and family obligations, his "blood pressure [was] through the roof," he had retained an attorney and filed a charge with the EEOC, and Pizzuto should direct all communications to his attorney). Thus, there is a dispute of material fact regarding the second prong.

Next, we must determine whether PPL subjected Renna to an adverse employment action subsequent to Renna's filing of an EEOC charge. To establish an adverse employment action, Renna points to PPL's refusal to

transfer Renna and the March 11, 2016 decision-making leave.[20] Renna's

Brief at 36-38. Even if the denial of the transfer request could constitute an

adverse employment action by PPL as opposed to a restriction imposed by

the Union, the denial of the request occurred prior to Renna's filing of the

EEOC charge. Thus, the only relevant adverse action in this case is the

placement of Renna upon decision-making leave. *See* Trial Court Opinion,

6/12/2018, at 26 (determining that Renna's one-day suspension and

twenty-four month probation period likely qualifies as a materially adverse

employment action pursuant to *Burlington N. & Santa Fe. Ry. Co. v.*

*White*, 548 U.S. 53, 73 (2006)).

The final portion of the analysis is whether there is a causal connection

between placement of Renna on decision-making leave and Renna's filing of

the EEOC charge.

> To establish the requisite causal connection a plaintiff usually
> must prove either (1) an unusually suggestive temporal
> proximity between the protected activity and the allegedly
> retaliatory action, or (2) a pattern of antagonism coupled with
> timing to establish a causal link. In the absence of that proof the

---

[20] Renna also argues that he was subjected to an adverse employment action because PPL failed to correct the hostile work environment in retaliation for Renna's filing of the EEOC charge. However, Renna does not discuss the legal standards applicable to such a claim, and offers no analysis of the specific treatment he was subjected to between the filing of the EEOC charge and PPL's discipline of him, whether PPL management knew or should have known about any co-worker harassment during that timeframe, and whether PPL management failed to take prompt and adequate remedial action during that timeframe. *See Moore v. City of Phila.*, 461 F.3d 331, 350 (3d Cir. 2006). Therefore, he has waived this argument by failure to develop it in his brief. *See McEwing*, 77 A.3d at 647.

plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation.

*Ferraro*, 185 A.3d at 405 (citation omitted).

The trial court determined that because PPL placed Renna on decision-making leave more than a month after filing the EEOC charge, the timing alone is not unusually suggestive of a causal connection. Trial Court Opinion, 6/12/2018, at 28 (citing *Rosati v. Colello*, 94 F. Supp. 3d 704, 717 (E.D. Pa. 2015) for the proposition that to be unusually suggestive, the adverse action must generally occur within days of the protected conduct, not months); *see also Ferraro*, 185 A.3d at 405 (holding employee did not establish causal link between internal age discrimination complaint in 2010 and firing in 2012, and there was no evidence from the record as a whole from which the fact-finder should have inferred causation); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (noting between two and ten days is unusually suggestive, but two months is not).

Renna argues the trial court should have considered the timeframe between Renna's notice to Pizzuto that he filed an EEOC charge and the discipline, which spanned only 15 days.[21] Renna's Brief at 43. Whether this timing alone is unusually suggestive or not, we hold that the short time span combined with Pizzuto's denial that he had knowledge of the EEOC charge before he disciplined Renna, which is at odds with the email he forwarded to

---

[21] Renna incorrectly calculates the timing between February 25, 2015 and March 12, 2015, as 13 days.

HR in the record, **see** 2/25/2015 Email Chain, is enough at the *prima facie* stage to make out a claim for a causal link.

Since Renna has put forth enough evidence at this stage to create a dispute of material fact regarding his *prima facie* case,

> the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action. If the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action. Although the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times.

**Daniels**, 776 F.3d at 193.

The trial court held that PPL advanced a legitimate, non-retaliatory reason for having taken the adverse action: its claim that it placed Renna on decision-making leave because he made potentially threatening comments about Von Oehsen to Pizzuto. Trial Court Opinion, 6/12/2018, at 28. Although Renna denies that he said he was going to beat up Von Oehsen, he did admit that he told Pizzuto that PPL had to do something before he snapped. Renna Deposition at 210-16. At this juncture, PPL merely has the burden of production, not persuasion, which does not involve a credibility assessment. **See Kroptavich**, 795 A.2d at 1055. Thus, because PPL articulated a legitimate business explanation, it successfully rebutted the presumption of discriminatory intent created by Renna's *prima facie* case. **See id.**

- 31 -

Accordingly, the burden of persuasion shifts back to Renna "to demonstrate weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions from which a reasonable juror could conclude that [PPL's] explanation is unworthy of credence, and hence infer that the employer did not act for the asserted non-retaliatory reasons." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 262 (3d Cir. 2017) (citation and quotation marks omitted).

The trial court determined that Renna produced no evidence that PPL's reason for his discipline was a *post hoc* fabrication to conceal its retaliatory animus or any direct evidence of retaliatory evidence.  Trial Court Opinion, 6/12/2018, at 30-31.  Renna, on the other hand, argues PPL's reason is a pretext because Renna denies telling Pizzuto that he was going to "beat [Von Oehsen] up."  Renna Deposition at 210.  He further questions the disparity between 24 months of probation he received versus the 12 months of probation Varec received when threatening Renna.[22]  Renna also emphasizes

_____

[22] Renna heavily relies upon his contention that a PPL officer, Timothy Newman, was concerned about the disparity in discipline between Renna and Varec.  *See, e.g.,* Renna's Brief at 40 (citing Opposition Brief at Unnumbered Exhibit (6/12/2015 3rd Step Grievance Meeting Notes)). However, even when viewing the facts in the light most favorable to Renna as the non-movant, the 6/12/2015 3rd Step Grievance Meeting Notes Renna cites do not support his claim that an officer of PPL questioned the disparity in discipline between Renna and Varec.  That document, parts of which are illegible, does not establish Newman's relationship to PPL or the person who made the statement; considering that Union representatives were at the meeting, without further discovery the document is ambiguous at best as to

*(Footnote Continued Next Page)*

the inconsistencies in the record regarding Pizzuto's knowledge of his EEOC charge.

Nevertheless, the record is clear that on its face, there was a disparity in discipline despite both employees' allegedly threatening harm to another employee. This, combined with the disparity in the record as to when Pizzuto became aware that Renna filed an EEOC charge, is enough at this stage for us to determine that a reasonable juror could conclude that PPL's explanation is unworthy of credence, and thus infer PPL did not act for the asserted non-retaliatory reason. *See Carvalho-Grevious*, 851 F.3d at 262. Our Supreme Court has emphasized "that it is not [a] court's function upon summary judgment to decide issues of fact, but only to decide whether there is an issue of fact to be tried." *Fine v. Checcio*, 870 A.2d 850, 862 (Pa. 2005) (citing Pa.R.C.P. 1035.2(1)). Further, the focus on summary judgment is not on weight and credibility; instead, it is "whether the proffered evidence, *if* credited by a jury, would be sufficient to prevail at trial." *Weaver v. Lancaster Newspapers, Inc.*, 926 A.2d 899, 906 (Pa. 2007) (emphasis in original). Accordingly, the trial court erred in granting summary judgment to PPL on Renna's retaliation claim.

*(Footnote Continued)* ———————————
who made the alleged statement. *See* 6/12/2015 3rd Step Grievance Meeting Notes.

## Conclusion

Because PPL's response to Renna's complaints were adequate as a matter of law, the trial court did not err by holding that Renna cannot establish the *respondent superior* prong of his hostile work environment claim. But because there is enough evidence in the record, which, if believed, would permit a reasonable juror to conclude that PPL retaliated against Renna for filing an EEOC charge, the trial court erred by granting summary judgment in favor of PPL.

Order granting PPL's motion for summary judgment affirmed in part and reversed in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/22/19