Steven STULTZ, Appellee,

v.

REESE BROTHERS, INC., Appellant.

Superior Court of Pennsylvania.

Submitted June 16, 2003.
Filed Oct. 28, 2003.

Jeffrey B. Balicki, Pittsburgh, for appellant.

David B. Consiglio, State College, for appellee.

Before: HUDOCK, BENDER and TAMILIA, JJ.

TAMILIA, J.

¶ 1 Reese Brothers, Inc., appeals from the judgment entered in favor of Steven Stultz in the aggregate amount of $56,196.97 plus interest, awarded as a result of the trial court's finding appellant had violated the Pennsylvania Human Relations Act[1] (PHRA) by failing to hire appellee and make accommodations for his disability. The October 31, 2002 Order entering judgment made final the July 13, 2002 Order which denied appellant's motion for post-verdict relief.

¶ 2 Appellant raises the following issues for review:

A. Whether the lower Court erred as a matter of law and/or abused its discretion by shifting the burden of proof to appellant to show that it was unable to provide a reasonable accommodation where appellee failed to request a specific accommodation?

B. Whether the lower Court erred as a matter of law and/or abused its discretion by substituting its judgment as against the weight of the credible evidence regarding appellee's qualifications to perform the essential functions of the job with or without an accommodation?

C. Whether the Court erred as a matter of law and/or abused its discretion by measuring Appellee's damages over a two year period when the weight of the credible evidence shows that only two percent (2%) of appellant's work force is still em-

ployed after two years in the position of telemarketer?

D. Whether the Court erred as a matter of law and/or abused its discretion by holding th[at] Appellee satisfied his duty to mitigate his damages by applying for employment at one employer over a two year period?

Appellant's brief at 4.

¶ 3 In 1997, appellee, who is afflicted with a permanent and progressive eye disease known as retinitis pigmentosa, sought employment as a telemarketer with appellant. As a consequence, appellee interviewed with a recruiter named Ruby Snyder, an acquaintance of his who was aware of his visual impairment. At the conclusion of the meeting appellee was offered the position, but ultimately he was unable to begin employment as he was sentenced to one (1) year incarceration for a drug offense.

¶ 4 In June 1998, after completing his sentence, appellee again sought employment with appellant as a telemarketer. This time he interviewed with Diane Chamberlain, who met appellant in the reception area and guided him by hand to her office. Chamberlain inquired about the extent of appellee's visual impairment and what visual aids might be available to assist appellee in performing his potential job as a telemarketer. In an effort to respond to Chamberlain's query, appellee thereafter obtained from the Altoona Office of Blindness and Visual Services, and submitted for appellant's consideration, two catalogs advertising visual aid products. Chamberlain in turn forwarded these catalogs to the Pittsburgh branch of the company for review and to determine if the company could accommodate appellee's disability.

---

1. 43 P.S. §§ 951 *et seq.*

¶ 5 Susan Burgess, Vice President of Human Resources, received the catalogs and forwarded them to Michael Marchey, manager in the Information Technology Department, to consider possible accommodations. The trial testimony established unequivocally, however, that no one in the company probed into whether screen magnifiers or larger monitors would be sufficient to accommodate appellee's needs. Trial testimony also revealed no one from appellant company had contacted the Altoona Office of Blindness and Visual Services to inquire into or discuss ways to accommodate appellee's disability. Marchey instead contacted EIS International, the developer of the software program used by appellant, to determine if another software program could be installed in order to accommodate appellee. In response, EIS informed Marchey that software-driven visual aid products were not compatible with the software program currently in use by appellant, and if unauthorized software was installed the appellant's warranties would be voided under its existing license and maintenance agreements with EIS International. Upon receipt of this information, appellant unilaterally concluded no reasonable accommodation could be made for appellee and consequently, decided not to hire him.

¶ 6 On April 26, 2000, appellee filed suit alleging discriminatory hiring practices in violation of the Pennsylvania Human Relations Act, 43 Pa.C.S.A. §§ 951–63, and Chapter 44 of Title 16 of the Pennsylvania Administrative Code, 16 Pa.Code §§ 44.1 et seq. Following a two-day bench trial, the trial court entered a verdict in favor of appellee in the amount of $30,458 plus interest, counsel fees and costs. Appellant's post-trial motions were denied on July 13, 2002, and judgment was entered October 31, 2002. This appeal followed.

¶ 7 Reese Brothers, Inc., first argues the trial court failed to apply and/or adhere to the correct standards of law in reaching its verdict. Specifically, in its first two issues appellant claims the court mistakenly shifted the burden of proof to it to affirmatively demonstrate it could not provide reasonable accommodation, and the court mistakenly held appellee is a "qualified individual with a disability." In that these claims are intricately related, we will address these challenges simultaneously.

¶ 8 The Pennsylvania Human Relations Act prohibits an employer from discriminating against any employee because of a disability. See 43 P.S. § 951 et seq. As the underlying cause of action is based on alleged violations of the act, we turn to the decisions of the federal courts for guidance in interpreting it. While we are not bound by federal courts' interpretations of parallel provisions in the Americans with Disabilities Act (ADA), 42 U.S.C.A. §§ 12101 et seq., and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 et seq., this Court may interpret the PHRA in accord with its federal counterparts. See, Imler v. Hollidaysburg American Legion Ambulance Service, 731 A.2d 169 (Pa.Super.1999), appeal denied, 560 Pa. 706, 743 A.2d 920 (1999); Kelly v. Drexel University, 94 F.3d 102 (3rd Cir.1996). The PHRA and the ADA deal with similar subject matter and are grounded on similar legislative goals. Imler at 173–74. Moreover, the PHRA definition of "disability" is substantially identical to the definition of "disability" under the ADA. See 42 U.S.C.A. § 12102(2), **Definitions;** 29 C.F.R. § 1630.2(g), **Definitions;** 43 P.S. § 954(p.1)(1)-(3), **Definitions.**

¶ 9 Under the ADA, an employer is prohibited from discriminating against, "a qualified individual with a disability be-

cause of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a), **Discrimination.** A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8), **Definitions.** A "disability" is: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(2), **Definitions.**

¶ 10 Based on the statutory definitions, in order for a plaintiff to establish a *prima facie* case of discrimination under the ADA, he must demonstrate:

> (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.

*Gaul v. Lucent Technologies,* 134 F.3d 576, 580 (3rd Cir.1998). The term "discrimination" in this context encompasses not only adverse employment actions driven by prejudice but also includes an employer's failure to make reasonable accommodations for the plaintiff's disabilities. *Taylor v. Phoenixville School Dist.,* 184 F.3d 296 (3rd Cir.1999). Under the ADA, an employer discriminates against a qualified individual with a disability when the employer fails or refuses to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C.A. § 12112(b)(5)(A), **Discrimination.**

¶ 11 It is not disputed that retinitis pigmentosa meets the statutory definition of "disability," and no one disputes the fact appellee was denied employment as a telemarketer due to his visual impairment. Hence, the first and third prongs of the test are satisfied and are not at issue. Appellant, however, challenges the trial court's conclusion that appellee is a qualified individual with a disability.

¶ 12 At the outset, we note that a trial court's findings of fact are accorded the same weight as a jury verdict and our scope of review is limited to examining whether the findings are supported by competent evidence. *Jenks v. Avco Corp.,* 340 Pa.Super. 542, 490 A.2d 912 (1985). In making such an evaluation, the Third Circuit Court of Appeals has held a plaintiff must " 'satisfy the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.' and, the plaintiff must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodations.' " *Taylor, supra,* at 311 *quoting Gaul v. Lucent Technologies, supra,* at 580. According to appellant's own job description, an applicant was considered qualified as a telemarketer if he possessed a high school diploma or G.E.D., good communication skills, the ability to learn new data and basic computer skills. *See* Appellant's Exhibit–12, Job Description for Telecommunicator.

¶ 13 As to the hiring process and requirements for the position, Diane

Chamberlain, the recruiter who interviewed appellee during his quest for employment following his release from prison, testified that due to the very high turnover rate in the position of telemarketer, she basically looked for anyone with a good disposition, clear enunciation and the ability to read, even if that individual lacked sales or computer skills. She further testified that although she preferred high school graduates, she had hired applicants without a high school diploma or its equivalent (N.T., 1/10/02, at 144, 156). In this context, Chamberlain testified appellee projected a professional image and appeared outgoing and self-motivated (*id.* at 145–46, 159). Moreover, the evidence on the record indicates appellee graduated from high school, completed one year of college and possessed adequate communication skills (*id.* at 11, 93–96; Appellant's Exhibit 3, Reese Brothers' Pre-employment application). Relying on the above, the trial court's conclusion appellee satisfied the prerequisites for the telemarketing position is supported by the record evidence.

¶ 14 Accordingly, we must determine whether or not, with reasonable accommodations provided by the employer, appellee is able to perform the essential functions of telemarketer. To determine the appropriate reasonable accommodation for a plaintiff's disability in accordance with the ADA, the Third Circuit Court of Appeals has articulated, "it may be necessary for the [employer] to initiate an informal, *interactive process* with the qualified individual with a disability in need of the accommodation." *Taylor, supra,* at 311 *quoting,* 29 C.F.R. § 1630.2(*o*)(3), **Reasonable accommodation** (emphasis added). The intended purpose of this interactive process is to, "identify the precise limitations resulting from the [qualified individual's] disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3), **Reasonable accommodation.**

¶ 15 Once the qualified individual with a disability makes a request for accommodation, it is unlawful for the employer not to make reasonable accommodations unless the employer can prove that the accommodation would impose an undue hardship on the operation of its business. *Taylor, supra,* at 311; 29 C.F.R. § 1630.9, **Not making reasonable accommodation.** The search for the appropriate reasonable accommodation is, "best determined through a flexible, interactive process that involves both the employer and the [individual] with a disability." *Mengine v. Runyon,* 114 F.3d 415, 419–20 (3rd Cir. 1997). As such, "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." *Taylor, supra,* at 312 *citing, Mengine, supra,* at 420. It logically follows, therefore, that a party who fails to communicate or engage in a dialogue with the other party is not acting in good faith. *Id.*

¶ 16 To trigger an employer's duty to participate in the interactive process, the disabled individual must put the employer on notice that he/she has a disability and, based on such notice, the employer must be able to reasonably deduce a request for accommodation has been made. *Id.* It is not essential for the individual with a disability to know and relay the specific names or details of his condition to the employer as long as the individual makes the employer aware of the disability and his desire for reasonable accommodation in plain English. *Id.* Here, we find the employer's duty to participate in the interactive process was triggered based on the following sequence of events.

¶ 17 On May 20, 1997, appellee completed appellant's pre-employment application

for the position of telemarketer. On the first of the three pages of the application, appellee clearly wrote, *"Need special equipment to see; Have hereditary blindness."* Appellant's Exhibit 3, Reese Brothers' Pre-employment application (emphasis added). As stated above, however, appellant was unable to assume a position at that time due to his incarceration. Approximately one year later, appellant re-applied for the position of telemarketer and was granted an interview. Chamberlain, who interviewed appellee, testified she was aware of appellee's "eyesight problems" and therefore guided him by hand through the office (N.T., 1/10/02, at 146). Chamberlain also testified she had in her possession appellant's prior employment application (*id.* at 145). Accordingly, appellant was on notice of appellee's disability.

¶ 18 Moreover, Chamberlain testified that during the job interview, she and appellee engaged in a dialogue about potential accommodations and, during that discussion, appellee even suggested certain visual aid products which may ease the limitations posed by his visual impairment (*id.* at 148–49). Following the interview, appellee called Chamberlain to inform her that he had dropped off for her review two catalogs from the Altoona Office of Blindness and Visual Services advertising visual aid products (*id.* at 148–151). Consequently, we find appellant's obligation to actively participate in the interactive process was triggered.

■■■ ¶ 19 As indicated above, the process calls for meaningful dialogue between the parties and the party that neglects to engage in this dialogue is acting in bad faith. *Id.* at 312. An employer can demonstrate good faith by taking measures similar to the following: "meet with the employee who requests an accommodation, request information about the condi-

tion and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and *offer and discuss available alternatives when the request is too burdensome."* *Id.* at 317 (emphasis added). Upon review of the record, we agree with the trial court's conclusion that appellant failed to participate in the interactive process therefore causing the breakdown in the process.

¶ 20 As indicated above, following the initial interview during which the parties briefly discussed possible accommodations and catalogs advertising visual aid products were obtained. The catalogs were referred to the human resource division of the corporate office (*id.* at 153) where they were scanned and forwarded to the Information Technology (IT) Department because, as Susan Burgess, the human relations manager explained, the material at hand pertained to, "computer related issues, computer related equipment" (*id.* at 154; N.T., 1/11/02, at 171). The matter then was relayed to Michael Marchey, a manager in the IT Department, whose search for reasonable accommodation was limited to inquiring into visual aid software programs (*id.* at 88–89, 102). Marchey testified he contacted an account representative of the software developer who wrote and installed the company's computer system to determine if any visual aid program could be installed safely onto the company's computer system to accommodate appellee; Marchey further testified he conducted his own independent investigation to determine the same (*id.* at 89–91, 96, 98). Following a two week probe, Marchey concluded nothing could be done to accommodate appellee (*id.* at 99–100). Subsequently, appellee was denied employment (N.T., 1/10/02, at 155).

■■■ ¶ 21 In keeping with the letter and spirit of the law, appellant had an

obligation to consult with appellee to ascertain the precise job-related limitations imposed by appellee's disability and, following appellant's own preliminary investigation, had an obligation to share both its findings with appellee and consult with him to identify alternative accommodations. *See Taylor, supra,* at 296. Despite appellee's repeated attempts to engage in a mutually fruitful dialogue, no dialogue ever occurred. In fact, after appellant's duty to participate in the interactive process was triggered, appellant initiated contact with appellee only once, to deny appellee employment (N.T., 1/10/02, at 155). Although appellant made an inquiry to its software program developer as to their ability to accommodate appellee, none of the visual aid products such as screen magnifiers explicitly suggested by appellee to Chamberlain during the initial interview was given consideration and/or tested by appellee to ascertain effectiveness (*id.* at 52–54, 151–152). In sum, there was no interaction between the litigants because appellant refused to participate in the process.

¶ 22 The trial court's Opinion makes it abundantly clear that it found in favor of appellee because the evidence demonstrated appellant was solely responsible for the breakdown in the interactive process. *See* Trial Court's Opinion, Carpenter, J., 4/25/02. Appellant's first claim reads in pertinent part, "the lower Court erred as a matter of law and/or abused its discretion by shifting the burden of proof to appellant to show that it was *unable* to provide a reasonable accommodation...." Appellant's brief at 4 (emphasis added). In its Opinion, the trial court states, "the burden shifts to Reese Brothers to show they were unable to provide Plaintiff a reasonable accommodation to perform as a telemarketer." Trial Court Opinion at 6. We agree with appellant that in stating the

burden shifted to appellant to affirmatively demonstrate it was "unable" to provide a reasonable accommodation, the trial court, at minimum, mischaracterized the law. At the same time, however, appellant cannot prevail based on this claim because, as noted above, the trial court's decision was based on appellant's failure to participate in the interactive process. *See* Trial Court Opinion at 8. Although appellant did not have an affirmative duty to prove there was no reasonable accommodation available, it did have a duty to engage in a meaningful dialogue with appellee to determine if a reasonable accommodation could be made for him.

¶ 23 Even under circumstances demonstrating that the employer did not make a good faith effort to assist the individual with a disability in finding reasonable accommodations, however, in order to prove that the employer failed to participate in the interactive process the individual must still demonstrate he reasonably could have been accommodated and performed the job. *Taylor, supra,* at 317–20. Herein we agree with the trial court conclusion that if visual aid products such as the screen magnifiers explicitly suggested by appellee during the initial interview had been considered, appellee would have been able to perform the essential functions of the job (N.T., 1/10/02, at 52–54, 151–152). Further, "the [fact finder] is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations." *Taylor, supra,* at 318. We therefore conclude the trial court correctly ruled in favor of appellee.

¶ 24 As to damages, appellant contends the trial court erred by awarding twenty-eight months of back pay given the very low retention rate in the profession. Appellant also claims the award was excessive in light of the fact appellee failed to

mitigate his damages by seeking alternative employment.

■ ¶ 25 When faced with a claim that an award of damages was excessive we must be, "ever-mindful that our standard of review is extremely narrow." *Taylor v. Celotex Corp.,* 393 Pa.Super. 566, 574 A.2d 1084, 1098 (1990) *quoting, Glomb v. Glomb,* 366 Pa.Super. 206, 530 A.2d 1362, 1368 (1987) *appeal denied,* 517 Pa. 623, 538 A.2d 876 (1988). The determination of damages lies initially within the discretion of the jury, which weighs the evidence and assesses the credibility of the witnesses. *Id.* We will not disturb the decision absent a clear abuse of that discretion. *Id.*

■ ¶ 26 In its Opinion the trial court notes that it limited the award of damages to the value of salary and benefits from the time of appellee's reapplication in September of 1998 through December of 2000. The court's adjudication process was twofold. First, the court balanced appellee's possible greater than normal longevity given his limited range of employment opportunities and demonstrated self-motivation with the high turnover rate in the telemarketing profession (N.T., 1/10/02, at 24, 143; N.T., 1/11/02, at 154–55). Second, the court considered appellant's employment policy implemented in January of 2001 which would have resulted in appellee's immediate termination due to his failure to disclose his criminal history on his application (N.T., 1/11/02, at 163–64). As the trial court's determination of the damages was based solidly on the record, we find no abuse of discretion in this regard.

■ ¶ 27 As to the last remaining issue concerning appellee's alleged failure to mitigate damages, we again find no relief is due. In these matters plaintiffs have a duty to mitigate damages. *Lesko v. Clark Publisher Services,* 904 F.Supp. 415 (M.D.Pa.1995). The burden of proving that a plaintiff failed to exercise reasonable diligence in seeking comparable or equivalent employment lies with the defendant/appellant. *Booker v. Taylor Milk Co., Inc.,* 64 F.3d 860 (3rd Cir.1995). To meet this burden the employer must demonstrate that substantially comparable work was available and the plaintiff failed to exercise reasonable due diligence in seeking alternative employment. *Id.* In this regard, we find appellant has not carried its burden of proof.

¶ 28 Judgment affirmed.

¶ 29 BENDER, J., notes his dissent.