J-A24035-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| PORSHA BARBOSA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHATHAM ACRES HEALTHCARE | : | |
| GROUP, INC.; ELLEN MOUNTFORD; | : | |
| KELLEY BOWLER | : | No. 528 EDA 2019 |
| | : | |
| | : | |
| APPEAL OF: CHATHAM ACRES | : | |
| HEALTHCARE GROUP, INC. | : | |

Appeal from the Order Entered December 21, 2017
In the Court of Common Pleas of Delaware County Civil Division at
No(s): No. 11-2443

BEFORE:   BENDER, P.J.E., DUBOW, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED NOVEMBER 26, 2019**

Chatham Acres Healthcare Group, Inc. (Chatham Acres) appeals from the December 17, 2017 decision of the Honorable G. Michael Green, following a six-day non-jury trial, which found in favor of plaintiff, Porsha Barbosa (Barbosa) and against defendant Chatham Acres and defendant Kelley Bowler (Bowler) only, and in favor of defendant Ellen Mountford,[1] Chatham Acres' administrator (Administrator) and against Barbosa, for retaliation in violation

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Chatham Acres' administrator, Ellen Mountford, died in January, 2018.

of the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 955(a) *et seq*. For the reasons set forth below, we affirm.

Barbosa brought claims against Chatham Acres, Administrator, and weekend nurse-supervisor Bowler, alleging discriminatory and retaliatory discharge under PHRA and various other common law claims.[2] The Trial Court found in favor of all defendants on four of the five claims, but found in Barbosa's favor on her retaliation claims, and awarded her: (a) economic damages in the form of lost back pay and lost employment benefits in the amount of $123,161, and (b) compensatory damages for emotional harm in the amount of $184,000, for a total award amount of $307,161. Trial Court 1925(a) Opinion at 1. By decision and order dated December 21, 2018, the Trial Court further ordered attorney's fees in the amount of $386,342.50 and costs in the amount of $35,803.66. *Id*. at 2-3. Chatham Acres timely filed a motion for post-trial relief, which was denied.[3] This appeal followed.[4]

---

[2] Plaintiff also alleged discrimination on the basis of race in violation of the PHRA, defamation, intrusion of privacy – intrusion upon seclusion, and concerted tortious conduct (defamation). The Trial Court found against Barbosa on all of these claims.

[3] Chatham Acres filed its Notice of Appeal on February 14, 2019 and its Rule 1925(b) Statement of Errors Complained of on Appeal on March 21, 2019. On April 11, 2019, the Trial Court entered its 1925(a) Opinion. Bowler filed a motion for post-trial relief on January 2, 2018, which was denied; she did not appeal.

[4] Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The

The Trial Court's lengthy and comprehensive findings of fact can be summarized as follows. Chatham Acres is a long-term health care facility with skilled nursing, sub-acute, and immediate care units. Barbosa began working at the facility in June 2009; it was her first position as a licensed practical nurse (LPN), and she performed her job in a satisfactory manner. Her job duties included the assessment of patients, and provision to residents of medical treatment and medication as well as assistance with eating. Nancy Wiler was director of nursing (Nursing Director). Barbosa worked from 7 a.m. until 3 p.m., from Monday to Friday, and the same hours on alternate weekends; her supervisor on weekdays was Donna Berk, the assistant director of nursing (ADN) and her supervisor on weekends was Bowler, who served on weekends as the most senior supervisor at the facility. Barbosa became concerned regarding Bowler's job performance, specifically her frequent tardiness, and the impact of her tardiness on patient care; she discussed these concerns with Bowler, but Bowler's late arrivals continued. Barbosa then informed ADN that the quality of care was being adversely impacted by Bowler's tardiness; she also informed Nursing Director that Bowler failed to respond to her when she paged her over the loudspeaker in the facility. ADN

findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We will consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary. ***Bank of New York Mellon v. Bach***, 159 A.3d 16, 19 (Pa. Super. 2017).

relayed Barbosa's concerns that residents' medications were not being timely administered to Administrator and to Nursing Director, and Nursing Director communicated Barbosa's complaints to Bowler. Trial Court Decision, 12/21/17 (Tr. Ct. Op.), Findings of Fact (F.F.) ¶¶ 2-3, 7-9, 11-15, 17-23, 26, 29-36.

On Sunday, March 28, 2010, Barbosa completed her work shift at 3 p.m., and returned to the facility's parking lot where her black 2009 Hyundai Sante Fe was parked; she discovered what she believed to be human feces smeared on the hood of her car. Barbosa immediately reentered the facility and reported the incident to ADN, who was there in a nurse capacity only. ADN advised Barbosa to report the incident to Bowler, as the supervisor in charge, and also advised her to report the incident to the police. Barbosa informed Bowler of the incident, and further informed Bowler that she suspected either Bowler herself or a nurse's aide, Amy Shank (Shank), who was working that day and was a friend of Bowler's, was responsible for the act. Barbosa then drove to the Pennsylvania State Police barracks in Avondale. While driving to Avondale, Barbosa received a text message, read aloud by her Blackberry smart phone, which read: "That's y I put shit on ur car n------," using the racial epithet. She reported the feces-smearing incident and the text message to Trooper Covert, who determined the telephone number for the device originating the text message, called the number, and received a voicemail message. Trooper Covert then asked Appellee whether she knew anyone named "Kelly." Records provided by Sprint indicated the

subscriber for the phone was "Kelley Bowler." Records also indicated that the account for this phone number was suspended on the following day, March 29, 2010; on that same day, Bowler made a report to the state police claiming her cell phone had been stolen. It was established that on March 28, 2010, the day of the incident, the contact information for this cell phone account was changed to another phone number, which is the same number that appears for Bowler on the telephone contact list maintained for Chatham Acres employees. Tr. Ct. Op., F.F. ¶¶ 37, 40-67.

When Barbosa reported for work on Monday, March 29, 2010, she informed Administrator, who was unaware of the feces-smearing incident and the receipt of the text message, and related that she had reported the incident to the state police. On that same day, a state trooper arrived at Chatham Acres to investigate Bowler's claim that her cell phone had been stolen from the facility on the previous day. The Chatham Acres handbook requires employees who believe they have been subjected to discrimination or harassment by anyone at work to report it immediately to a department head or to Administrator, to be promptly and thoroughly investigated. The Trial Court found that the state trooper who came to Chatham Acres on March 29, 2010, was present to investigate Bowler's claim that her cell phone had been stolen on the previous day, and not Barbosa's complaint regarding the

previous day's incidents of alleged race-based discrimination.[5]  On Monday, March 29, 2010, Administrator terminated Shank, having concluded that Shank had smeared feces on Barbosa's vehicle, and thereby violated the facility's policy against racial discrimination and harassment.  Barbosa subsequently spoke with ADN, Nursing Director, and Administrator, advising each of them that she did not want to work again under the direct supervision of Bowler, because she believed Bowler had sent the text message; to that

---

[5] At trial, Administrator testified that she first heard about the feces-smearing incident and the offending text message at 7 a.m. on Monday, March 29, 2010, when Barbosa reported it to her in the stairwell of the building.  Transcript of Testimony (N.T.) at R.380a, R.508a.  Administrator testified initially that Bowler was not present in the building that day, N.T. at R.392a, and that Bowler telephoned her sometime between 9 a.m. and 11 a.m. and reported that her cell phone had been stolen. N.T. at R.400a.  Administrator stated that she then repeated to Bowler what Barbosa had told her about the feces-smearing and the text message. N.T. at R.402a.  However, Administrator also testified that later that day, a state trooper arrived at Chatham Acres, to conduct an investigation, and that the investigation consisted of interviews with Bowler, Barbosa, and Shank in her office, which she sat in on and observed, and that each interview lasted approximately fifteen minutes.  N.T. at R.557a.   Administrator testified that she believed that the police investigation conducted in her office that day amounted to a "complete and thorough investigation," which enabled her to make the decision to immediately terminate Ms. Shank's employment based on her belief that Ms. Shank smeared the feces on Barbosa's vehicle.  N.T. at R.417a, R.559a. Notwithstanding Administrator's testimony, the record includes a police report indicating that Bowler was interviewed, not at Chatham Acres but at her home, on March 29, 2010, and it was she who told police that Ms. Shank admitted to her that she had put the feces on Barbosa's automobile; Bowler also told police she believed that Barbosa held her responsible, and that she believed that Barbosa had stolen her cell phone to retaliate.  Exhibit P-2, at R.1412. The police report further states that Barbosa and Shank were each interviewed at Chatham Acres on that same day.  *Id*.  Barbosa testified that at the March 29, 2010 interview at Chatham Acres, the state police did not question her at all about the feces-smearing or the text message, but only asked questions regarding the missing cellphone. N.T. at R.1087a.

end, Barbosa offered to work a weekend shift other than the 7 a.m. to 3 p.m. shift, but Administrator failed to consider all available scheduling options, and her request was not granted. The Trial Court found that both Administrator and Chatham Acres failed to take reasonable steps to protect Barbosa from the person whom Barbosa reasonably and in good faith believed had participated in the feces-smearing incident and sent her the racially derisive text message. Tr. Ct. Op., F.F. ¶¶ 68-73, 76-79, 82-87.

Saturday, April 24, 2010 was the first date Barbosa next worked under Bowler's supervision. Barbosa parked her car in the front row of the rear parking lot that day. While looking out the third floor window where she was working, together with fellow LPN Jessica Spohn (Spohn), Barbosa observed Bowler in the parking lot near Barbosa's car. Barbosa told Spohn that she was going to take a break, which was permitted under Chatham Acres' policies, to move her vehicle, and handed Spohn her medical cart keys; Spohn later confirmed that five to ten minutes elapsed between the time Barbosa left and the time Barbosa returned to the third floor. Barbosa worked her scheduled shifts the following Sunday, Monday, and Wednesday, April 28th without incident. However, on April 28th, Bowler informed Administrator that on April 24, 2010, she had observed Barbosa leave the building, get into her car and drive off towards the front of the building, and reported to Administrator that Barbosa returned to the facility approximately 45 minutes later; Bowler did not observe Barbosa return in her car, but she reported that she had obtained information from two housekeeping subcontractor personnel to support her

description of Barbosa's movements.  Administrator launched an investigation of Barbosa's conduct.  Although Administrator stated that she spoke with Spohn, who was working with Barbosa that day, Spohn testified that no one from Chatham Acres interviewed her regarding Bowler's moving of the vehicle.  Administrator terminated Barbosa's employment that same day, April 28, 2010.[6]  Tr. Ct. Op., F.F. ¶¶ 88-103.

The Trial Court found that the information assembled during the investigation of Barbosa and available to Chatham Acres through its Administrator did not establish that she left the premises on April 24, 2010, nor did it establish a timeline for Barbosa's relocation of her vehicle that day, and at trial, Administrator was unable to identify any specific information upon which she relied in terminating Barbosa's employment due to the alleged incident of April 24, 2010.  Tr. Ct. Op., F.F. ¶ 103.

---

[6] Administrator memorialized the events culminating in the termination of Barbosa's employment in a summary she prepared that same day. Exhibit P-16, at R.1454a.  In it, she indicates that Bowler reported earlier in the day on April 28, 2010, to Nursing Director, that she saw Barbosa get into her car at 9 a.m. on April 24, 2010, and drive "off the property." *Id*.  In the summary, Administrator further states that "[Bowler] stated that [Barbosa] did not return until 9:55 a.m," that two housekeeping personnel witnessed [Barbosa] leaving," and that [Bowler] went outside and asked the housekeeping personnel, who verified that [Barbosa] had driven off. *Id*.  In the summary, Administrator recounts the explanation provided by Barbosa in the course of the meeting (that she was moving her car, and it didn't take more than 10 minutes), and Barbosa's statement to her at that time that she "thought she was being fired because of the issue about a month ago." *Id*.  Administrator's summary concludes, "[Barbosa] was reminded that was a separate issue and that she had placed all the residents in jeopardy by her just driving off for whatever the reason," and that Barbosa was then asked for her keys and she left. *Id.*

At trial, Barbosa presented expert witness testimony of Andrew C. Verzilli, MBA, who concluded that her actual damages from the termination of her employment at Chatham Acres were (a) loss of back-pay of $94,655 plus loss of tuition reimbursement of $28,506. *Id*., F.F. ¶ 112.

On appeal, Chatham Acres presents the following issues:

A. The Trial Court erred in concluding that Chatham Acres was liable to Ms. Barbosa under a Cat's Paw Theory;

B. The Trial Court erred in finding that [Administrator] and Chatham Acres did not conduct any investigation into the March 28, 2010 report from Ms. Barbosa.

C. The Trial Court erred in relying on inadmissible hearsay in relation to its findings about Jessica Spohn;

D. The Trial Court erred in awarding Ms. Barbosa lost wages during times when she removed herself from the workforce to attend school;

E. The Trial Court erred in awarding Ms. Barbosa damages for sums she spent on attending school after her termination when Chatham Acres did not offer tuition reimbursement; and

F. The Trial Court erred in awarding Ms. Barbosa damages for alleged emotional distress over a seven-year period when the only evidence of emotional distress introduced at trial was an essay that Ms. Barbosa wrote in 2011.

Appellant's Brief at 4-7 (unnecessary capitalization omitted).

We first address Chatham Acres' argument that the Trial Court erred in its finding of liability for retaliation under the Cat's Paw Theory.

> "The term "cat's paw" derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward."

*Staub v. Proctor Hospital*, 562 U.S. 411, 415 n.1 (2011) (citation omitted).

We find no error in the Trial Court's conclusion that Chatham Acres was liable to Barbosa under the Cat's Paw Theory. Under the Cat's Paw theory, "[i]f a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable…" *Staub*, 562 U.S. at 422 (footnote and emphasis omitted). Thus, by effectuating a discriminatory employee's unlawful design, the "employer plays the credulous cat to the malevolent monkey and, in so doing, the employer allows itself to get burned – i.e., successfully sued." *Vasquez v. Empress Ambulance Service, Inc*.,[7] 835 F.3d 267, 272 (2d Cir. 2016).

Here, Chatham Acres argues that Bowler's act was not motivated by a retaliatory animus, and that there is insufficient evidence that Bowler intended

---

[7] "In general, we analyze PHRA claims by using the same standards as analogous federal statutes. Further, we look to federal court decisions to inform our interpretations of the PHRA, although such decisions are not binding on our court." *Renna v. PPL Electric Utilities, Inc.*, 207 A.3d 355 n.16 (Pa. Super. 2019) (citations omitted).

to cause an adverse employment action. Chatham Acres contends further that Bowler's act was not a proximate cause of the employment action, but rather that Administrator conducted an independent investigation prior to arriving at the decision to terminate Barbosa's employment. We do not agree.

The Trial Court found that Barbosa proved that Bowler was indeed motivated to retaliate against her, since "[Bowler] knew that [Barbosa] had told [Administrator] she suspected [Bowler] as the sender of the racially divisive text message and a participant in the feces-smearing incident." Tr. Ct. Op., Conclusions of Law (C.L.) ¶ 39. In addition to the knowledge that Barbosa had reported to Administrator that she believed Bowler had participated in the feces-smearing incident and had sent her the text message employing a racial epithet, the evidence established that approximately one month prior to the incident, Barbosa had reported to ADN that Bowler's tardiness was adversely impacting the quality of care provided to residents and that Bowler failed to respond to her when she paged her over the loudspeaker system. ADN relayed these complaints to Nursing Director and to Administrator, and Nursing Director then communicated Barbosa's complaint about Bowler directly to Bowler. Tr. Ct. Op., F.F. ¶¶ 29-36. Bowler testified that she told the state police that she believed Barbosa had stolen her cell phone and then sent the racist text message to herself; she further testified that she had reported to the state police that Ms. Shank, the nurse's aide, had confessed to her that she had smeared the feces on Barbosa's car. Transcript of Testimony (N.T.) at R.159a-160a, R.200a, R206a. Moreover,

- 11 -

the Trial Court found that Barbosa simply did not participate in any wrongful conduct on April 24, 2010, but rather followed accepted practice in the taking of a short break to move her vehicle. Tr. Ct. Op., C.L. ¶ 41.

Bowler's intent to cause an adverse employment action is amply demonstrated by the record evidence. Barbosa testified that on her first day back at work under Bowler's supervision following the feces-smearing incident, she looked out a window and observed Bowler near her car, on a cell phone. N.T. at R.1107a. Worried that there could be more vandalism to her vehicle, Barbosa decided to take a permitted break in order to move her car. N.T. at R.1107a. Bowler testified that sometime between 11 a.m and 1 p.m., while she was preparing her med cart in a room on the first floor, facing the back parking lot, she observed Barbosa walking to her car, getting into it, and driving away. N.T. at R.177a. She reported to Nursing Director that Barbosa had gotten into her car and driven off for approximately 45 minutes, and she reported that she had identified two housekeeping personnel who were available to confirm that Barbosa had driven off in her car. N.T. at R.178a, R.218a. In making this report, Bowler provided no context to explain Barbosa's alleged actions, failing to mention that according to Spohn, alongside whom Barbosa was working that day, Bowler called Spohn immediately after Barbosa went downstairs to move her car, asked Spohn if Barbosa had told her where she was going, and received Spohn's response that "[Barbosa] was moving her car and would be back in a couple of minutes." Record Exhibit P-49 (redacted) at R. 1417-1418. Spohn testified, consistent

with a signed statement she provided to investigators in August 2010, that Barbosa was back on the floor in 5-10 minutes, and in neither the investigation that took place immediately following Bowler's report nor at any time thereafter did anyone ask Spohn what had really happened. N.T. at R.671a.; Exhibit P-49 (redacted) at R.1418, R.1420. Bowler did not attempt to call Barbosa, in an effort to determine where she might have gone, but rather decided that when Barbosa "returned to the facility," she would "let her know that she needs to report off and hand keys off when she is not – when she decides to leave the facility." N.T. at 181a.

We further reject the argument that Bowler's act in reporting job abandonment by Barbosa was not a proximate cause of Administrator's decision to terminate Barbosa's employment. The Trial Court concluded that "all of the information upon which [Administrator] relied was supplied by – or originated from – [Bowler], and but for [Bowler's] retaliatory actions, [Barbosa] would not have been terminated." Tr. Ct. Op., C.L. ¶ 38. It is clear that Administrator knew, or should have known that April 24, 2010 was the first day that Barbosa worked under the supervision of Bowler after the events of March 28, 2010; indeed, Barbosa testified that when she saw the schedule for April 24th, she once again requested a change in her schedule so as not to have to work under Bowler that day. N.T. at R.1103a. Chatham Acres' argument that Administrator conducted an independent investigation of the incident reported by Bowler upon which she based her decision, and that Bowler's report had "no influence whatsoever" on her decision to terminate

Barbosa's employment, Chatham Acres' Brief at 42, is belied by the evidence of record. The Trial Court concluded that the information assembled during Administrator's investigation and available to Chatham Acres did not establish that Barbosa had left the premises, nor did it establish a timeline for Barbosa's relocation of her vehicle that day, and that at trial, Administrator was unable to identify any specific information upon which she relied in terminating Barbosa's employment. Tr. Ct. Op., C.L. ¶ 104. It found that approximately five to ten minutes elapsed between Barbosa's leaving the third floor to move her vehicle and arriving back there. *Id*., F.F. ¶ 98. In the memo prepared on the very day Barbosa's employment was terminated, Administrator stated that her decision was based on the fact Barbosa left the grounds without notifying her supervisor, an abandonment of employment that left the residents in jeopardy. Exhibit P-16, R.1454a. Administrator recounted the information provided by Bowler, and significantly did not refer to Spohn, the LPN with whom Barbosa was working that day, or any information she may have provided. *Id.* In this written memorialization of the events surrounding Barbosa's termination, Administrator stated that Bowler reported to Nursing Director that Barbosa got into her car and drove "off the property". *Id*. Administrator's statement reads, specifically, "[o]n Saturday, April 24, 2010, [Barbosa] was seen getting into her car at approximately 9:00 a.m. and driving off the property. [Bowler] stated she did not return until 9:55 a.m." *Id*. There was no testimony at trial that either of the two subcontractor personnel witnessed Bowler leaving the grounds or that anyone other than

Bowler reported that information. In sum, evidence supports the Trial Court's finding that Administrator's decision to terminate Barbosa's employment was based on Bowler's report, and that the adverse action would not have occurred without Bowler's retaliatory actions on April 28, 2010.

We find no merit in Chatham Acres' second issue, which challenges three of the Trial Court's 112 findings of fact, specifically those set forth as Findings Nos. 76, 78, and 105 in its decision. Tr. Ct. Op. at 15, 22. Chatham Acres asserts that the Trial Court concluded, based on these findings, that no investigation was made into the March 28, 2010 report of alleged racial discrimination, thereby calling into question the business judgment employed by Administrator. Chatham Acres' Brief at 31. In Finding No. 76, the Trial Court determined that the state trooper who visited Chatham Acres on March 29, 2010 was there to investigate Bowler's claim that her cell phone had been stolen, not the March 28th incidents of race-based discrimination. In Finding No. 78, the Trial Court found that even after Shank was terminated, Barbosa remained concerned about her work environment because no action had been taken to investigate her receipt of the text message. In Finding No. 105, the Trial Court found that Barbosa credibly testified that she believed her work environment to be hostile because of the feces-smearing incident, the uninvestigated text message, and her employer's refusal to remove her from Bowler's supervision.

The record supports each of these findings. Pennsylvania State Police Trooper Covert, who interviewed Barbosa when she reported the feces-

smearing incident and the text message at the police barracks on March 28, 2010, indicated in his report, *inter alia*, that "Trooper Nicholas LONG interviewed all individuals on 3/29/10 relating to a stolen cell phone case." Police Report, at R.1409a. Barbosa testified that during her interview with the state policeman at Chatham Acres on March 29, 2010, she was asked questions about the missing cellphone, but not about the incidents of the day before. N.T. at R.1089a. Clearly, events related to the feces-smearing incident were discussed during the state policeman's interview with the nurse's aide, Shank, on March 29, 2010; Administrator testified that she made her decision to terminate Shank's employment that day "based on the information presented in those interviews," and her belief that Shank had smeared the feces on Barbosa's automobile. N.T. at R.507a. Administrator testified that no conclusion was reached about the text message and there is ample evidence that, after Ms. Shank's employment was terminated because it was determined that she had smeared feces on Barbosa's car, no further investigation occurred. N.T. at R.437a, 559a. Administrator testified that she never questioned or confronted Bowler as to Barbosa's suspicions or asked her directly whether she participated in the feces-smearing incident or in the sending of the text message, because she had the benefit of observing, but did not participate, while the state police questioned various parties, including Shank and Barbosa; Bowler, however, was not at work on that day, and so was interviewed by the state police at her home, and not at Chatham Acres. N.T. at R.404a, 406a. Administrator testified further that after she fired Ms.

Shank later that day, there were no more text messages, and so she "figured that the person who had put the feces on the car possibly also had sent the text message…" N.T. at R.411a. Administrator testified that, following the state police interviews at Chatham Acres that day, she believed it to have been a "complete and thorough investigation," N.T. at R.417, and that "observing the state police investigation and making my own decision and my own judgment call on this, is part of an independent investigation." *Id.* Finally, the Trial Court clarified, in its 1925(a) Opinion, that its findings regarding the investigation also included its finding, in Finding No. 77, that Administrator terminated Shank's employment after she concluded that Shank had violated Chatham Acres' policy against racial discrimination by smearing the feces on Barbosa's automobile, and Finding No. 15, wherein it found that Barbosa had acknowledged that Administrator *did* conduct an investigation of the incidents resulting in the termination of Shank. Trial Court 1925(a) Opinion at 27. We find no error or abuse of discretion by the Trial Court.

Chatham Acres next argues that the Trial Court erred in relying on inadmissible hearsay in relation to its findings about Jessica Spohn, the LPN who was working with Barbosa on the day she left the building to move her automobile. The Trial Court found that Spohn corroborated Barbosa's account of that day and that, contrary to Administrator's claim that she spoke with Spohn, no one from Chatham Acres interviewed Spohn regarding the moving of Barbosa's vehicle on April 24, 2010. Tr. Ct. Op., F.F. ¶¶ 97, 103. (**See** N.T. at R.671a.) Spohn testified at trial that she did not recall the August 5,

2010 day on which she gave a statement to a private investigator regarding the incident, and that the statement only refreshed certain portions of her recollection. N.T. at R.583a, R.586a. However, Spohn further testified that the recollection she gave the investigator on that date, which was fifteen weeks after the underlying incident, was fresh in her mind at the time she gave it. N.T. at R.629a. When questioned as to whether she believed that her signed statement was true and correct at the time she gave it, Spohn stated, "]y]es…it was fresh in my brain at the time." N.T. at R.661.

Pennsylvania Rule of Evidence 803.1(3) is an exception to the rule against hearsay that permits the admission into evidence of a "Recorded Recollection of a Declarant Witness." The Rule requires that the declarant testifies, is subject to cross-examination, and (A) the recording is "on a matter the declarant-witness once knew about but now cannot recall well enough to testify fully and accurately"; (B) the recording "was made or adopted by the declarant-witness when the matter was fresh in his or her memory;" and (C) "the declarant-witness' testimony in the recording accurately reflects his or her knowledge at the time when made." Pa.R.E. 803.1(3). Citing *Heller v. Unemployment Compensation Board of Review*, 427 A.2d 737 (Pa. Cmwlth. 1981) (a writing recorded approximately 12 weeks after underlying event failed to qualify as a recorded recollection), Appellants argue the information was not "fresh," and further assert that because Ms. Spohn testified she did not remember the events described in her statement or the

day on which she wrote it, it could not satisfy 801.1(3)(C). The Trial Court addressed this issue in its 1925(b) Opinion:

> Spohn testified the statement only refreshed certain portions of her recollection, and over the objection of defense counsel, a redacted statement was admitted. The redacted version only revealed statements which Spohn agreed refreshed her recollection as to certain relevant events…Clearly, witness Spohn on several occasions at trial confirmed she had limited recall surrounding the events of April 24, 2010. She had difficulty recalling events that did not directly involve her. [Spohn's statement] was created and subsequently executed by Spohn when the matter was fresh in her memory. Finally, Spohn candidly testified as to only certain portions of [Spohn's statement] as confirmed by the significant redactions to the document. As such, the redacted [version of Spohn's statement] was admitted into evidence and the weight afforded to said document was solely within the province of the trial court.

Trial Court 1925(b) Opinion at 29-30 (citations to notes of testimony and exhibits omitted). We find no error in the Trial Court's decision to admit this redacted exhibit; moreover, we commend the Trial Court for the great care that it took in reaching its decision.

In its three final issues, Chatham Acres argues that the Trial Court erred and abused its discretion in awarding various damages to Barbosa. Under the PHRA, the court may award lost wages or "any other legal or equitable relief as the court deems appropriate." 43 P.S. § 962 (c). The determination of damages lies within the discretion of the trial court, who must weigh the evidence and assess the credibility of the witnesses; we will not disturb the decision absent a clear abuse of the trial court's discretion. *Stultz v. Reese Brothers, Inc.*, 835 A.2d 754, 764 (Pa. Super. 2003).

Chatham Acres objects to the award of lost wages to Barbosa during time periods when it alleges she removed herself from the workforce in order to attend school, and further challenges the award for tuition reimbursement, asserting that such reimbursement was not offered at Chatham Acres. Chatham Acres' Brief at 58, 62. However, the evidence established that although Barbosa pursued her education in nursing on a part-time basis after her termination, she did so while continuing to work as many hours as were made available to her as a result of her ongoing job search. She testified that in order to resume immediate full-time employment, she "went to job fairs, online, went to different facilities to fill out applications," but that no facility offered her a full-time position until July, 2010. N.T. at R.888a. Furthermore, it was established that it was possible for her to attend school part-time and still work a full-time job, should such full-time job had been available to her, and that Barbosa had not at any time gone to school more than part-time. N.T. at R.1395a.

Reduction of back pay is not required under PHRA for a period when a plaintiff took courses, where she was available for full-time work. *Taylor v. Central Pennsylvania Drug and Alcohol Services Corporation*, 890 F. Supp. 360, 375 (M.D. Pa. 1995) (under PHRA, former employee's back pay award not offset or reduced for time periods during which she attended school, where she actually continued to work 30-35 hours per week and was available to work full-time).

In addition, Barbosa's expert economic witness, Andrew C. Verzilli, MBA, who was found by the Trial Court to be "candid and credible," Trial Court 1925(a) Opinion at 43, testified that Barbosa's annual earning potential as an LPN, had she remained at Chatham Acres, was $43,680. N.T. at R.989a, 991a. To arrive at Barbosa's total past lost earnings, Mr. Verzilli further valued her health benefits, subtracted her actual earnings in 2010 prior to her termination from employment, and documented her actual earnings post-termination for the remainder of 2010 ($4200), and for the years 2011 ($8,004) and 2012 ($25,858). N.T. at 991a. He determined that beginning in 2013, she was earning over $51,000 annually, or an amount in excess of what she would have earned at Chatham Acres and had therefore fully mitigated her earnings as an LPN at Chatham Acres. *Id*. He reviewed and relied upon information provided by a vocational expert, Daniel M. Rappucci, to determine Barbosa's tuition expense loss, as $28,506. N.T at 993a. It was established that Barbosa learned of Chatham Acres' tuition reimbursement policy at her job orientation, when she received the employee handbook, and had read and discussed said policy with Administrator. N.T. at R. 873a-877a; Exhibit P-17, Employee Handbook at R.1421a-1455a. Administrator testified that there was a written tuition reimbursement policy in effect as of February 2009, it was subsequently changed, but that the handbook was not revised accordingly, and no written notice of the elimination of tuition reimbursement was furnished to employees. N.T. at R.367a. We find that given the Trial Court's broad discretion in fashioning a remedy where, as here, retaliation has

been found, the Trial Court did not err in awarding Barbosa $94,655 for loss of back pay, including employer provided health benefits, and $28,506 for loss of tuition reimbursement.

Finally, Chatham Acres challenges compensatory damages awarded for emotional distress, asserting they should not have been calculated over a seven-year period, when the only evidence introduced at trial was an essay that Barbosa wrote in 2011. Appellants' Brief at 6-7. Both compensatory and punitive damages are available under the PHRA. *Pennsylvania Human Relations Commission v. Zamantakis*, 387 A.2d 70 (Pa. 1978). "A plaintiff's own testimony of embarrassment and humiliation can be sufficient to support an award for compensatory damages." *Girard Finance Company v. Pennsylvania Human Relations Commission*, 52 A.3d 523, 536 (Pa. Cmwlth. 2012); 43 P.S. § 959(f)(1). "An award under the [PHRA] serves not only to restore the injured party to pre-injury status, but also to discourage future discrimination." *McGlawn v. Pennsylvania Human Relations Commission*, 891 A.2d 757, 775 (Pa. Cmwlth. 2006). Barbosa testified as to the changes in her life as a result of her retaliatory firing, her "devastation" and "shame", applying for unemployment compensation benefits, taking her daughter out of a day care facility she enjoyed, battling depression, "feeling as though she wanted to die for the first time in her life," and feeling as though she had been "hit with a racist punch in the face." N.T. at R.1160-61a; Exhibit P-85, Plaintiff's Essay at R.1446a. The Trial Court found her entitled to compensatory damages under PHRA, noting her "mental anguish, humiliation,

and embarrassment, which began with the loss of her employment on April 28, 2010, and was apparent to this court seven years later as Mrs. Barbosa testified during the trial of this civil action." Trial Court 1925(a) Opinion at 44. We discern no legal error or abuse of discretion in the award of compensatory damages here.

Accordingly, we affirm the judgment of the Trial Court.

Judgment affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/26/19