J-A16037-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMERCIAL REALTY GROUP, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARKET SQUARE PLAZA | : | No. 1233 MDA 2020 |
| ASSOCIATES, LP F/K/A SAGE | : | |
| MARKET SQUARE PLAZA, LP; FB | : | |
| HARRISBURG GENERAL, INC.; | : | |
| MARKET SQUARE PLAZA, LLC | : | |

Appeal from the Judgment Entered December 22, 2020
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2015-CV-3731-CV

BEFORE: KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: AUGUST 23, 2021**

Appellant, Commercial Realty Group, Inc., appeals from the Judgment entered following a non-jury trial in the Court of Common Pleas of Dauphin County on December 22, 2020, after the trial court's denial of Appellant's Post-Trial Motion.[1] Following a careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] In their briefs, the parties purport to appeal from the May 29, 2020, Order denying Appellant's Post-Trial Motion, and the trial court indicates the appeal is from that Order in its Pa.R.A.P. 1925(a) Opinion. However, the appeal properly lies from the judgment entered following disposition of the post-trial motion. **See Mackall v. Fleegle**, 801 A.2d 577, 580 (Pa. Super. 2002) (appeal does not properly lie from order denying post-trial motions, but rather upon judgment entered following disposition of post-trial motions). The

*(Footnote Continued Next Page)*

In its Opinion filed pursuant to Pa.R.A.P. 1925(a), the trial court thoroughly and accurately detailed the relevant facts and procedural history herein as follows:

Factual Background

[Appellant] initiated this action by writ of summons in May 2015 and later filed a Complaint asserting it was entitled to a commission/commissions related to its brokering the rental of office space in Market Square Plaza, a commercial property at 17 North Second Street in Harrisburg Pa. (the Property). [Appellant] is a real estate brokerage firm that leases and sells commercial and industrial properties, investments and businesses. The record developed in this case to date, including the record submitted to the [c]ourt in consideration of [collective Appellees' Market Square Plaza Associates, LP, f/k/a Sage/MSPA Market Square Plaza, LP; FB Harrisburg General, Inc.; Market Square Plaza, LLC] summary judgment motion as well as testimony and evidence supplied at a later hearing, is as follows:

*Lease Negotiations*

The Property was initially owned by Defendant Market Square Plaza, LLC (Market Square Plaza) and later by Defendant Sage/MSPA Market Square Plaza, LP, now known as Market Square Plaza Associates, LP (Sage/MSPA). Defendant FB Harrisburg General, Inc. (FB Harrisburg) is the current general partner of Sage/MSPA.

Market Square Plaza, a single-purpose limited liability company, purchased the Property in February 2003. It consists of approximately 90 condominium units. The original members of Market Square Plaza were Anthony Pascotti (president), Thomas Flynn, Richard Reynolds and Richard Friedman. Pascotti was a co-managing principal in the development of the Property.

In 2004, the Pennsylvania Department of Banking was seeking commercial office space for its Harrisburg headquarters

_____

caption correctly indicates the appeal is from the judgment entered on December 22, 2020; therefore, this Court does not need to amend it.

and put out bid specifications (specs) through the Pennsylvania Department of General Services (DGS). Pascotti learned of its need for space in 2004 while having dinner with Fred Clark and the Secretary of the Department of Banking. Clark was a consultant for Market Square Plaza hired to assist it in securing a lease from the Commonwealth. Clark began working directly with the Secretary of Banking, his designees and with the Governor's Office to promote and secure space for the Department of Banking. Clark never worked with, nor was he aware of, [Appellant] or its agents Thomas Mallios and Bogumila "Bo" Mangam. At all relevant times, both Mallios and Mangam were licensed by the Pennsylvania Real Estate Commission and Mallios managed [Appellant]. Market Square Plaza's Pascotti also did not work with [Appellant], Mangam or Mallios during his attempts to secure the Department of Banking as a tenant for Market Square Plaza.

Cheryl Dondero, the project manager for the Department of Banking in charge of finding it office space, indicated that she did not pursue space at Market Square Plaza but rather it "came to [her] as an option" based upon a relationship between Market Square Plaza owners and the Secretary of Banking. Dondero did not recall working with Plaintiff or its agents Mallios or Mangam during the time period when she was looking for office space, while she was acting as liaison during lease negotiations or later during the Leasing Board's review of the proposed Lease. She testified that the spec sheet seeking space for the Department of Banking was created after Market Square Plaza had been brought to her "as an option" and that the spec sheet mirrored the space allocation plan that Dondero created for the Department of Banking. Furthermore, it was her belief that Market Square Plaza was the only building that would have fit the requirements set forth in the spec sheet as the Department of Banking "already knew the desired outcome."

At some point in 2004 while the Property was still under construction, the Flynn Group sent out a flier seeking brokers to find tenants. Pascotti and Flynn were the contacts listed on the flier. Bo Mangam responded on [Appellant's] behalf and attempted to obtain an agreement to broker office space in the Property.

As part of the process of leasing space to the Department of Banking, Mangam submitted three proposals on DGS forms. A first Proposal to Lease Space was submitted by Mangam on November 29, 2004, on behalf of Market Square Plaza for the lease of the Property. That Proposal was signed by Tom Flynn, as president of Market Square Plaza, on behalf of "Proposer." The second Proposal

to Lease Space was submitted by Mangam on December 14, 2004, on behalf of Market Square Plaza and again signed by Flynn on behalf of "Proposer." The final Proposal to Lease Space was submitted by Mangam on April 8, 2005, on behalf of Market Square Plaza, LLC. This Proposal was signed by Pascotti on behalf of "Proposer." Pascotti testified that he provided the information used to complete the final Proposal. This Proposal was submitted and included the initial term of the lease, two renewal term options and change in price per square foot that had not been in any prior version. Mangam was listed on all Proposals as the contact person for response from the Department of Banking. [Appellant] also asserted that its agent Mangam worked with Market Square Plaza's Flynn and Pascotti to review and complete the proposals and worked with DGS in negotiating the Lease. None of the Proposals to Lease Space provided for the payment of a commission to [Appellant].

While Mangam allegedly made some efforts in seeking to secure the Department of Banking as a tenant, as reflected in some of the documentary evidence, the precise nature of her efforts is unclear since she was not offered as a witness at the hearing. As such, this [c]ourt later found, following the hearing on the unjust enrichment claims, that it was Clark's efforts, coupled with Pascotti, that secured the Lease with the Commonwealth of Pennsylvania. Pascotti later communicated directly with the Department of Banking for the purpose of negotiating the Lease eventually executed on June 23, 2005 (discussed below).

*Commission Agreement and Lease*

On November 18, 2004, [Appellant] entered into a "Commission Agreement – Lease" (Commission Agreement) with "Tom Flynn / Phoenix Development Company," and not with Market Square Plaza, the owner/lessor of the property. [Appellant] had drafted the Commission Agreement and it was signed by Mangam on [Appellant's] behalf. The Commission Agreement states that it "shall be binding on the undersigned Owners ... and assigns."

Flynn/Phoenix Development Company were incorrectly identified in the Commission Agreement as the lessor of the Property and Flynn signed it on behalf of "Tom Flynn/Phoenix Development Co." listing himself as vice president. At the time, Phoenix Development Company's president was Donald Race, Jr. and its treasurer was John J. Ashdale; Flynn was not listed as an officer of Phoenix Development Company. Market Square Plaza's

president Pascotti was not aware of the execution of this Commission Agreement until after it had been entered.

An addendum, titled "Addendum No. I" (inexplicably dated before the Commission Agreement), was attached to the Commission Agreement and noted that the Commission Agreement had been entered between [Appellant] and "Phoenix Development Group, Inc." (and not Phoenix Development Company) "and/or assigns." The Addendum was also signed by Flynn. Phoenix Development Group is a different entity than Phoenix Development Company. At the time, Flynn was the president of Phoenix Development Group, which, as noted, was not a named party to the Commission Agreement. Neither Phoenix Development Company, Phoenix Development Group nor Flynn ever owned the Property, which as noted, was owned by Market Square Plaza. Flynn, then a co-managing partner of Market Square Plaza, did not sign the Commission Agreement on Market Square Plaza's behalf but rather in his capacity as vice president of the erroneously listed Phoenix Development Company.

Under the Commission Agreement terms, [Appellant], as broker, agreed to market the Property to DGS for the Department of Banking. In return, Flynn/Phoenix Development Company agreed to pay [Appellant] a 4% commission of the total aggregate gross rental of the initial lease plus 4% of the annual gross rental on any options, modifications or any new Lease executed by the tenant.

A few weeks prior to execution of the Commission Agreement, on November 1, 2004, Market Square Plaza's Pascotti, Flynn and Reynolds, signed a Lessor Identity Disclosure form as co-managing members of Lessor Market Square Plaza. In addition, on November 4, 2004, Market Square Plaza executed an "Agency Agreement/Limited Agent Authority" (Agency Agreement) with Plaintiff CRG and its agent Mangam. As part of the process of leasing to the Commonwealth, the "Proposed Lessor" was required to sign this agreement. The Agency Agreement listed Market Square Plaza as the proposed lessor and CRG/Mangam as the agent. Pascotti signed the Agency Agreement for Market Square Plaza. Under its terms, the agent was responsible for brokering the proposed lease of the Property and handling all negotiations with DGS/Department of Banking. The Agency Agreement stated that "agency to be binding during entire lease term." The Agency Agreement was a form document required by DGS for parties entering into government agency contracts. The Agency Agreement did not provide for the payment of a commission to [Appellant].

On June 23, 2005, the Department of Banking and Market Square Plaza entered into a ten-year Lease Agreement (Lease). Market Square Plaza's president, Pascotti, signed the Lease on behalf of Market Square Plaza. Pascotti negotiated the lease terms with the Deputy of Banking's Jim Henning and Dondero. The Lease provided for the rental of 15,634 square feet on the 11th Floor and 3,494 square feet on the 13th Floor. The Lease provided for two renewal options, the first from 2015-2020 and the second from 2020-2025. The initial annual rent was $443,769.60. The Lease was amended September 23, 2005 (First Amendment), modifying the square footage and the rent due. The terms of the First Amendment were not negotiated by [Appellant]; Dondero did not interact with [Appellant's] agents Mallios or Mangam during the First Amendment nor during any of the subsequent lease amendments for which [Appellant] claims a commission (discussed below).

[Appellant] asserted in its Complaint that after entering the Commission Agreement with Flynn/Phoenix Development Company, Phoenix Development Company assigned its rights and obligations thereunder to Market Square Plaza although it later admitted it had no such document. [Appellant's] president Mallios admitted that he is bound by the Real Estate Licensing and Registration Act (RELRA)[1] and that RELRA requires a written commission agreement between a real estate professional and the person from whom a real estate professional is seeking a commission.

*Sale of the Property and Commission Disputes*

On November 7, 2005, Market Square Plaza transferred title of the Property to Sage/MSPA for approximately Thirty Million Dollars. That same day, Market Square Plaza and Sage/MSPA executed an Assignment of Rights under a Declaration of Condominium for Market Square Plaza Condominium. The Assignment of Rights did not provide for an assignment of the Commission Agreement that had been entered between [Appellant] and Tom Flynn / Phoenix Development Company. A second document, an Assignment Agreement, was also executed that same day between Market Square Plaza and Sage/MSPA which assigned, transferred and set over to Sage/MSPA certain listed items including the Lease between Market Square Plaza and the Department of Banking. The Assignment Agreement did not provide for an assignment of the Commission Agreement entered between [Appellant] and Flynn/Phoenix Development Company.

Furthermore, none of the leases existing at the time of the Market Square Plaza - Sage/MSPA sale contained any provisions assigning any commissions for leases in place.

In the Fall of 2005, [Appellant's] agent Mallios became aware of the pending sale and he emailed Market Square Plaza's Pascotti alerting him of [Appellant's] continuing claim to commissions on any renewals under the Lease, as the broker who procured the Department of Banking as the tenant. Around the same time, a second broker, Equis Corporation (Equis) also claimed commissions under the Lease. Mallios informed Pascotti that [Appellant] intended to seek a lien against the Property sale if past commissions were not paid. Thereafter, funds were escrowed by Market Square Plaza to address the commission claims of [Appellant] and Equis.

All parties – [Appellant], Market Square Plaza, Sage/MSPA and Equis - began addressing the division of the escrow funds in December of 2005. There were email communications on December 15, 2005 between Mallios on behalf of [Appellant], Pascotti on behalf of Market Square Plaza, an Equis representative and Gary Brandeis, on behalf of Sage/MSPA. Brandeis was the single member entity owner of Sage/MSPA's general partner FB Harrisburg (formerly Market Square, GP, LLC), who represented Sage/MSPA and negotiated the sale with Market Square Plaza. Brandeis had not been initially aware of a Commission Agreement concerning the Property until just before the sale of the Property.

In the December 15, 2005 email chain, Brandeis responded as follows (Brandeis Emails):

> From our perspective, we want to make sure that it is clear that future commissions related to the tenant is also divided 65/35 among the brokers [CRG and Equis]. Once we receive the proper documentation, we will request the release of funds from the escrow agent.
>
> [W]e will need something in the agreement that provides for the landlord's maximum exposure for **future** commissions. We will not expose ourselves to any future commissions for this tenant beyond the stated commission rate even if they have a tenant rep broker. (emphasis added)

Brandeis admitted that his emails indicated Sage/MSPA would not expose itself to any future commissions above the 4% rate stated in the Commission Agreement. His intent, however,

had been to communicate that Sage/MSPA was not going to expose itself to commissions it was not obligated to pay. Ultimately, the parties did not resolve the issue of Sage/MSPA's exposure for future commissions as requested by Brandeis.

Despite being unable to come to terms about future commissions, on March 14, 2006, [Appellant], Market Square Plaza, Sage/MSPA, and Equis, executed a Settlement Release disbursing the escrowed funds. [Appellant] received a portion of the unpaid commission due on the initial lease term. The Release terms reflected that it was limited to past commissions due and not for any future commissions for future leases or renewals that might become due under the Commission Agreement. The parties also agreed that there was no admission of liability by any party.[2]

Despite threatening to place a lien on Market Square Plaza and successfully demanding an escrow for commission at closing, [Appellant] never requested that Sage/MSPA sign a commission agreement with [Appellant] nor did it attempt to secure a written assignment of the Commission Agreement with Sage/MSPA. According to Mallios, he claimed he had been given an oral representation by Sage/MSPA's Brandeis and Market Square Plaza's Pascotti that they would pay him commissions due, and as such, there was no need for a writing and none was ever produced. Mallios also relied upon the Brandeis Emails as an admission by Brandeis/Sage/MSPA that they were obligated to pay commissions.

In June 2007, Sage/MSPA paid $32,394.87 in commissions to [Appellant] for the exercise of an option to lease additional space.[3] Despite receiving a payment from Sage/MSPA, [Appellant] did not secure a written commission agreement with Sage/MSPA nor obtain an assignment of the Commission Agreement.

*Current Commission Disputes - Third and Fourth Lease Amendments and Lease Renewal Options*

On November 8, 2012 and May 3, 2013, respectively, the Department of Banking, then known as the Department of Banking and Securities, amended the Lease terms with Sage/MSPA and its general partner FB Harrisburg. The Third Amendment significantly expanded the leased space and increased rent due by $810,909.02. The Fourth Amendment involved a small expansion of square footage and increased rent due by $16,119.13.

The Third and Fourth Amendments were executed by Defendant FB Harrisburg as general partner for Sage/MSPA, through Brandeis. Brandeis asserted that the Amendments were solely negotiated by himself with no involvement by [Appellant], including by its agent Mallios. [Appellant] conceded that it did not have any specific involvement with the Third and Fourth Amendments but asserted they were made possible because [Appellant] had put the landlord and tenant together and had put the initial proposal and Lease together, thus permitting both expansion of space and extension of duration of the tenancy.

[Appellant] sought 4% commissions on the total increase in rent under the Third and Fourth Amendments, totaling $33,081.13, which Sage/MSPA refused to pay, asserting that at all relevant times, Sage/MSPA was not a party to a written agreement for commissions nor a written assignment of the initial Commission Agreement between Plaintiff and Flynn / Phoenix Development Company. Sage/MSPA also asserted that [Appellant] was not involved in and did not assist in the procurement of the Third and Fourth Amendments to the Lease.

After [Appellant] filed the Complaint in this action, the Lessee Department of Banking exercised both 5-year options renewing the Lease, for 2015-2020 and 2020-2025, respectively. These options generated over Eight Million Dollars in total rent payments. As of the hearing date (January 22, 2020), Plaintiff asserted total unpaid commissions and interest due of $402,886.42 it claims arose under the Third and Fourth Amendments and the two renewal terms.

Procedural Background

In Count I of its Complaint, [Appellant] alleges breach of contract against Defendant Market Square Plaza for failing to pay commissions due, pursuant to the Commission Agreement. In Count II, [Appellant] alternatively asserts a claim that Defendant Market Square Plaza has been unjustly enriched for retaining in commissions due [Appellant]. In Count III, [Appellant] alleges breach of contract against Defendants Sage/MSPA and FB Harrisburg for failing to pay commissions due under the Commission Agreement, noting that while Defendants were not owners of the Property when the Commission Agreement was entered, they purchased the Property with knowledge that the Commission Agreement was binding on future owners and assigns and/or that they ratified their obligation to pay commissions under the Commission Agreement by later making commission

- 9 -

payments to [Appellant]. In Count IV, [Appellant] alternatively asserts a claim that Defendants Sage/MSPA and FB Harrisburg have been unjustly enriched for retaining commissions due. Finally, in Count V, [Appellant] seeks relief in the form of a declaration that the Commission Agreement is jointly binding on all [Appellees] for payment to [Appellant] on all future commission including the lease renewals and any other potential extensions, options or modifications to the Lease.

After preliminary objections were dismissed by the Hon. Bruce Bratton, Defendants Market Square Plaza and Sage/MSPA filed a joint answer to the [C]omplaint. Notably, they denied any obligation under the Commission Agreement, noting that none of them were ever signatories thereto nor had been assigned any obligations under the Commission Agreement. Instead, they agreed that the Commission Agreement had been entered between non-party Tom Flynn and Phoenix Development Company.

After a period of inactivity, [Appellant] sought a status conference to remove the matter from the purge list and deadlines for dispositive motions were set by the Hon. John Cherry. On March 30, 2018, [Appellees] filed a motion for summary judgment and the matter was assigned to this [c]ourt.

Following the submission of a response, briefs and oral argument, this [c]ourt issued an Order December 21, 2018 granting summary judgment in [Appellees'] favor on the breach of contract claims (Counts I, III). This [c]ourt found that "[Appellant] does not have a contract with any of the named [Appellees] and said [Appellees] are not assigns of the entity which executed the Commission Agreement with [Appellant]." This [c]ourt denied summary judgment on the unjust enrichment claims (Counts II, IV) finding that there remained genuine questions of material fact. Finally, this [c]ourt denied in part and granted in part the request for declaratory relief consistent with the [c]ourt's order.

A bench trial limited to unjust enrichment claims was held before this [c]ourt on January 22 and 23, 2020. Following trial, the parties submitted proposed Findings of Fact and Conclusions of Law. On May 29, 2020, following review of the record and the parties' filings, this [c]ourt issued its own "Findings of Fact and Conclusions of Law," which was in the nature of an opinion and order, finding in [Appellees'] favor on the unjust enrichment claims (Counts II, IV) and the request for declaratory judgment (Count V) grounded upon a theory of unjust enrichment. The order was later amended June 15, 2020, to correct a minor error.

- 10 -

On June 25, 2020, [Appellant] filed a timely post trial motion. After [Appellees] responded, and following oral argument, this [c]ourt issued an Order on August 28, 2020, denying the Post Trial Motion. Plaintiff filed a timely appeal from the denial of post-trial relief, currently pending.[2]

_____

[1] 63 P.S. §§ 455.101-902.

[2] The 2006 Settlement Release, as well as a 2007 Settlement Release, were precluded from admission at the hearing by Court Order of January 21, 2020, following consideration of [Appellee's] motion in limine. During the hearing, however, the 2006 Settlement Release was deemed admissible for limited purposes as reflected in the narrative related to this footnote. (See N.T. 73)[.]

[3] The subject matter of this transaction was addressed in a 2007 Settlement Release, which was precluded from admission by this Court (see Footnote 2).

Trial Court Memorandum Opinion, filed 12/9/20, at 2-11.

In its brief, Appellant presents the following Statement of Questions

Involved:

1. Whether the [t]rial [c]ourt erred in granting summary judgment on the breach of contract counts in the complaint where there was a written Commission Agreement that the parties acted in accordance with and that such agreement satisfied the

_____

[2]Appellant filed a premature notice of appeal on September 22, 2020, because, as stated in footnote one above, this appeal properly lies from the Judgment entered in the trial court on December 22, 2020. Notwithstanding, we will treat the instant appeal as if it were filed after the entry of judgment on December 22, 2020, which is the appealable order. ***See McEwing v. Lititz Mut. Ins. Co.***, 77 A.3d 639, 645 (Pa.Super. 2013) (citing Pa.R.A.P. 905(a) (providing that "[a] notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof") and ***Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.***, 948 A.2d 834, 842 (Pa.Super. 2008) (treating defendant's appeal from the verdict as having been taken from the final judgment when judgment was entered after the appeal had been filed)).

requirement of the Real Estate Licensing And Registration Act ("RELRA")?

2. Whether the [t]rial [c]ourt erred in finding that Appellant failed to satisfy its burden of proof with respect to the claims for unjust enrichment and that it was barred in recovering on those claims by the Real Estate Licensing and Registration Act ("RELRA") despite the fact that RELRA is silent as to its application to actions in quasi-contract?

Brief for Appellant at 6.

Generally,

[o]ur appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

*Amerikohl Mining Co. v. Peoples Nat. Gas Co.,* 860 A.2d 547, 549-50 (Pa.Super. 2004) (citations omitted).

Our standard of review of the trial court's grant of summary judgment is *de novo* and the scope of review is plenary. *American Southern Insurance Co. v. Halbert*, 203 A.3d 223, 226 (Pa.Super. 2019). Summary judgment may be granted only where there is no genuine issue of any material fact pertaining to a necessary element of the cause of action or defense or where, after the completion of relevant discovery, the party who will bear the burden of proof at trial has failed to produce evidence of facts sufficient to prove all elements of the cause of action or defense. Pa.R.C.P. 1035.2; *US*

*Coal Corp. v. Dinning*, 222 A.3d 431, 437-38 (Pa.Super. 2019); *Renna v. PPL Electric Utilities, Inc.*, 207 A.3d 355, 367-68 (Pa.Super. 2019).

In considering whether there is a genuine issue of material fact or sufficient evidence of the elements of a cause of action or defense, this Court must view the record in the light most favorable to the non-moving party and resolve all doubts against the moving party. *US Coal Corp.*, 222 A.3d at 437; *Renna*, 207 A.3d at 367; *Shiner v. Ralston*, 64 A.3d 1, 4 (Pa.Super. 2013).

Appellant first asserts the trial court erred in granting summary judgment upon finding the Commission Agreement entered into in this case was not a viable contract agreement that meets the requirements of the RELRA, 63 P.S. §§ 455.101–455.902. Brief for Appellant at 19, 23. Appellant reasons that:

> The Commission Agreement clearly satisfies the requirements of RELRA in that it is a written agreement that states the nature of the service and the fee to be charged. The Commission Agreement was signed by the agent. It was signed by Mr. Flynn on behalf of the Lessor and while it did not specifically identify the entity, Market Street Plaza, the parties acted as if it did. Regardless of the confusion of Flynn, the Commission Agreement caused [Appellant] to act for the benefit of Market Street Plaza in the leasing of office space to the Commonwealth. Flynn and Pascotti proceeded to execute all of the documents required by the Department of General Services regarding the leasing of space to the Commonwealth of Pennsylvania that indicated Market Street Plaza was the Lessor and that [Appellant] was its broker/agent.

*Id*. at 21.

"To successfully maintain a cause of action for breach of contract the plaintiff must establish: (1) the existence of a contract, including its essential

- 13 -

terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." ***Albert v. Erie Ins. Exch.***, 65 A.3d 923, 928 (Pa.Super. 2013) (citation omitted). Our Court previously has determined:

> Generally[, a]n agreement is an enforceable contract wherein the parties intended to conclude a binding agreement and the essential terms of that agreement are certain enough to provide the basis for providing an appropriate remedy. If the essential terms of the agreement are so uncertain that there is no basis for determining whether the agreement has been kept or broken, there is not an enforceable contract.
>
> * * *
>
> [T]he question of whether an undisputed set of facts establishes a contract is a matter of law. It is also well settled that in order for an enforceable agreement to exist, there must be a "meeting of the minds," whereby both parties mutually assent to the same thing, as evidenced by an offer and its acceptance. It is equally well established that an offer may be accepted by conduct and what the parties do pursuant to the offer is germane to show whether the offer is accepted. In cases involving contracts wholly or partially composed of oral communications, the precise content of which are not of record, courts must look to the surrounding circumstances and course of dealing between the parties in order to ascertain their intent. We must, therefore, look to the parties' course of conduct to ascertain the presence of a contract.

***United Environmental Group, Inc. v. GKK McKnight, LP***, 176 A.3d 946, 963 (Pa.Super. 2017) (citations omitted) (brackets in original).

The RELRA establishes specific standards of conduct and licensing which pertain to all persons engaged in the sale or transfer of real property within this Commonwealth. **See**, *e.g.,* 63 P.S. § 455.301. "A principal purpose of the Act is to protect buyers and sellers of real estate, the most expensive item many persons ever buy or sell, from abuse by persons engaged in the business." **Meyer v. Gwynedd Dev. Grp., Inc**., 756 A.2d 67, 69 (Pa.Super.

2000) (citation omitted). For this reason, an oral modification of a term of such an agreement, which is required under the RELRA to be in writing, cannot support a claim for commissions or fees brought pursuant to the Act. ***Michael Salove Co. v. Enrico Partners, L.P.***, 23 A.3d 1066, 1071 (Pa.Super. 2011).

The trial court herein found Appellant had not established that it and Appellees were bound by a valid commission agreement and in doing so reasoned as follows:

> In its statement of errors raised on appeal, [Appellant] argues the grant of summary judgment was error because there was in fact a written agreement, the Commission Agreement, with which the parties acted in accordance. [Appellant] alternatively argues the summary judgment grant was issued in error where the execution of the Commission Agreement by Tom Flynn for Phoenix Development Company and/or Phoenix Development Group was either a mutual mistake or a ruse perpetrated by Defendant Market Square Plaza by Flynn for the benefit of Defendant Market Square Plaza.
>
> This [c]ourt rejected [Appellant's] first argument, that there existed a valid Commission Agreement binding [Appellant] and either or both [Appellees]. RELRA establishes specific standards of conduct which pertain to all persons engaged in the sale or transfer of real property within the Commonwealth. Meyer v Gwynedd Dev. Group, 756 A. 2d 67 (Pa.Super. 2000). [Appellant] is a "licensee" and [Appellees] are "consumers" as defined in RELRA. 63 P.S. § 455.201. Section 455.606a(b)(1) provides:
>
>> (b)(1) **A licensee may not perform a service for a consumer of real estate services for a fee, commission or other valuable consideration paid by or on behalf of the consumer unless the nature of the service and the fee to be charged are set forth in a written agreement between the broker and the consumer that is signed by the consumer**. This paragraph shall not prohibit a licensee from performing services before such an agreement is signed, but the licensee is not entitled to recover a fee,

- 15 -

commission or other valuable consideration in the absence of such a signed agreement.

63 P.S. §455.606a(b)(l) (emphasis added). Thus, in order to receive payment for any commissions, this Section requires an express contract signed by the parties. The failure to abide by RELRA results in the inability to collect a commission. Michael Salove Co. v. Enrico Partners, L.P., 23 A.3d 1066. 1071 (Pa. Super. 2011); see also, Schutter v. Herskowitz, No. CIVA 07-3823, 2008 WL 2673375, at *3-4 (E.D. Pa. June 30, 2008). ("[RELRA] provisions, taken as a whole, make it unmistakably clear that a real estate broker licensed in Pennsylvania is required to obtain a written agreement, signed by the consumer and specifying the services to be performed along with an assurance that the agreement as to the fees and services was "the result of negotiations" between the broker and the customer. Accordingly, where there is no such signed written agreement, a broker may not recoup any "fee, commission or other valuable consideration." (citing See 63 P.S. §§ 455.606a, 455.608a; 49 Pa. Code §§ 35.281, 35.331)).

[Appellant] has admitted that there was no written contract with any of the named [Appellees] nor was there a written assignment to either [Appellee]. The only possible party that could have been responsible to pay [Appellant] a commission, based upon the four corners of the Commission Agreement, was Phoenix Development Company, which was not a named party in this action. [Appellant's] agent Mallios admitted that he is bound by RELRA, inasmuch as it requires a written commission agreement between a real estate professional and the person from whom a real estate professional is seeking commission. As a result, there cannot be a breach of a non-existent agreement between [Appellant] and either named [Appellee]. Because there is no written agreement between [Appellant] and any [Appellees] from whom [Appellant] seeks a commission which meets RELRA requirements, paying any commission upon such would violate RELRA.

[Appellant] suggested that other documents in the record supported its claim for commissions, which this [c]ourt rejected. The Agency Agreement does not provide for the payment of a commission to [Appellant]; nor do any of the Proposals to Lease Space provide for payment of a commission to [Appellant]. Mallios admitted that he had not negotiated the right of the Commonwealth to expand the square footage of their leasehold interest. As such, [Appellant] is not entitled to commissions on

expansions or renewals as paying such commissions would be violative of even the scope of Mallios'/[Appellant's] equitable claim, if any.

[Appellant's] failure to secure a written assignment or post-Lease written commission agreement with Market Square Plaza or Sage/MSPA makes recovery impermissible under Section 455.606a(b)(l) of RELRA, because there is no binding contract. Furthermore, all writings between [Appellant] and either named [Appellee] lacked the required elements to comply with RELRA.

Trial Court Opinion, filed 12/9/20, at 13-15 (emphasis in original).

Upon review of the certified record and viewing the evidence in the light most favorable to Appellant, as our standard of review requires, we discern no error by the trial court in granting summary judgment on Appellant's breach of contract claims. The trial court made a legal determination that the written Commission Agreement upon which Appellant relies was not entered into by any of the named Appellees in the instant cause of action, and there was no assignment thereof to any of the named Appellees. *See* N.T. Non-Jury Trial, at 90; the record supports this finding.

In fact, it is undisputed that Appellees did not sign the Commission Agreement or Addendum No. 1., and Mr. Mallios acknowledged at trial that such action was required in order for Appellant to seek a commission pursuant to the RELRA. *Id*. at 86-87; *see also* Trial Court findings of Fact and Conclusions of Law, filed 5/29/20, at ¶ 16.

Moreover, Mr. Flynn had no recollection of ever being presented with a proposal by Ms. Mangam to lease space, and he did not sign the Proposal to Lease Space. N.T. Non-Jury Trial 1/23/2020, at 194. Importantly, Appellant

admits "the confusion of Flynn" regarding the Commission Agreement in the portion of its brief quoted above. *See* Brief for Appellant at 21. This admitted confusion thwarts Appellant's attempt to show the Commission Agreement was binding upon Appellees, for there could not have been a "meeting of the minds" with regard to the terms thereunder where one of the necessary signatories denies his signature appears on the document and testifies he has no knowledge of the terms contained within it. ***See United Environmental Group. In., supra***.

Also, the email chain Appellant references commenced after the property had been sold to Sage/MSPA on November 9, 2005, and at that time both Appellant and Equis Corp. claimed they were owed a commission. N.T. Non-Jury Trial, 1/22/20, at 107-110. Despite the fact that emails continued for several months, a written commission agreement providing for Sage/MSPA's exposure for future commissions never was created. ***Id***. at 72, 106-109. Appellant did not request that Sage/MSPA, through Mr. Brandeis or Mr. Pascotti, sign a commission agreement.

To the contrary, Mr. Mallios testified he relied on an oral representation during a telephone conversation with Mr. Bandeis regarding the payment of a commission. ***Id***. at 97-98. However, this alleged oral representation clearly does not satisfy the writing requirements of the RELRA**. *See Moyer*, *supra***.

Mr. Mallios possessed nothing in writing other than the Commission Agreement on which to base Appellant's claim to commissions. N.T. Non-Jury

Trial, 1/22/20 at 106, 109-10. Yet, he admitted he is bound by RELRA and its terms, understood that RELA requires the existence of a written commission agreement between Appellant and the person or entity from whom a commission is sought, and knew that both parties must agree to the terms of such commission agreement. *Id*. at 86-87. Simply put, Appellant did not comply with RELRA to secure a written commission agreement with any of Appellees despite Mr. Mallios' knowledge that a specific writing was required under RELRA and his having numerous opportunities to obtain one. *Id*. at 97-98.

Appellant alternatively posits the trial court erred in failing to award it commissions upon a theory of unjust enrichment. In doing so, Appellant reasons:

> [t]here is no doubt that Market Square Plaza and Sage/MSPA have been unjustly enriched where benefits (the rent paid by the Commonwealth) were conferred on them by [Appellant's] services; where they have appreciated the payment of the rent; and where they accepted and retained the benefits under circumstances that are inequitable for them to do so without payment of value on the commissions due on the lease renewals and the expansions of space (both provided for in the Lease).

Brief for Appellant at 27.

When considering this issue, we are mindful of the following:

> Unjust enrichment is an equitable doctrine, whose elements we have described as [(1)] benefits conferred on defendant by plaintiff, [(2)] appreciation of such benefits by defendant, and [(3)] acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. .... The critical inquiry in the application of this doctrine is whether a defendant has been

- 19 -

unjustly enriched. Where unjust enrichment is found, the law implies a contract, referred to as either a *quasi contract* or a contract implied in law, which requires that the defendant pay to plaintiff the value of the benefit conferred.

***Karden Constr. Servs., Inc. v. D'Amico***, 219 A.3d 619, 628 (Pa.Super.

2019), *appeal denied*, 229 A.3d 234 (Pa. 2020) (citation and quotation marks

omitted).  In addition,

[t]he most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff. Where unjust enrichment is found, the law implies a quasi-contract which requires the defendant to pay to plaintiff the value of the benefit conferred. In other words, the defendant makes restitution to the plaintiff in *quantum meruit.* By its nature, the doctrine of quasi-contract, or unjust enrichment, is inapplicable where a written or express contract exists.

***Lackner v. Glosser***, 892 A.2d 21, 34 (Pa.Super 2006)(citations omitted).

To resolve this claim, we must consider whether under the facts

presented herein an award of unjust enrichment is recoverable under RELRA.

In ***Phelps v. Caperoon***, 190 A.3d 1230 (Pa.Super. 2018), this Court

summarized the well-settled rules of statutory construction:

The Statutory Construction Act, 1 Pa.C.S. §§ 1901-1991, sets forth principles of statutory construction to guide a court's efforts with respect to statutory interpretation. In so doing, however, the Act expressly limits the use of its construction principles.

The purpose of statutory interpretation is to ascertain the General Assembly's intent and to give it effect. In discerning that intent, courts first look to the language of the statute itself. If the language of the statute clearly and unambiguously sets forth the legislative intent, it is the duty of the court to apply that intent and not look beyond the statutory language to ascertain its meaning. Courts may apply the rules of statutory construction only when the statutory language is not explicit or is ambiguous.

We must read all sections of a statute together and in conjunction with each other, construing them with reference to the entire statute. When construing one section of a statute, courts must read that section not by itself, but with reference to, and in light of, the other sections. Statutory language must be read in context, together and in conjunction with the remaining statutory language.

Every statute shall be construed, if possible, to give effect to all its provisions. We presume the legislature did not intend a result that is absurd, impossible, or unreasonable, and that it intends the entire statute to be effective and certain. When evaluating the interplay of several statutory provisions, we recognize that statutes that relate to the same class of persons are *in pari materia* and should be construed together, if possible, as one statute.

Also, when interpreting a statute we must listen attentively to what the statute says, but also to what it does not say.

**Phelps**, 190 A.3d at 1236 (quoting **Retina Assocs. of Greater Phila., Ltd. v. Retinovitreous Assocs., Ltd.**, 176 A.3d 263, 270 (Pa. Super. 2017) (alteration omitted)).

The Legislature specifically drafted RELRA to require licensees and consumers to establish a direct relationship and memorialize the same in a clearly written and properly executed agreement. As Appellees stress, "[n]othing in RELRA transforms the Ancillary Documents or the email chain into a written and signed commission agreement. . . . The relationship between Appellant and Appellees is, pursuant to statute, founded upon a contract, but that contract does not exist." Brief for Appellees at 18-19 (footnotes omitted).

Thus, had the trial court allowed Appellant's unjust enrichment claim to go forward, it would have acted contrary to the plain language of Subsection

- 21 -

455.606a(b)(1) of RELRA which precludes a recovery of a fee, commission, or other consideration for brokerage services absent an express contract signed by the licensee and the party from whom the licensee seeks the commission.

Moreover, in light of the fact that Appellant did not secure the original Lease with the Commonwealth, the trial court did not err in determining Appellant was not entitled to equitable relief on this basis. Mr. Clark testified that it was he and Mr. Pascotti who advanced Market Square Plaza as a property to be identified for banking, and no one associated with Appellant or Mr. Mallios had ever been involved in those discussions. N.T. Non-Jury Trial, 1/22/20, at 139-40. Mr. Pascotti testified he never interacted with Mr. Mallios in securing the Lease, and he did not recall Ms. Mangam being involved in identifying Market Square Plaza as a potential place for Banking. N.T. Non-Jury Trial, 1/23/20, at 264-65.

Ms. Dondero also testified she was unaware of Appellant and did not recall working either with Mr. Mallios or Ms. Mangam when Market Street Plaza was brought to her attention in her position by the Department of Banking as the Director of Administrative Services. N.T. Non-Jury Trial, 1/23/20, at 157, 165-66, 169.

As the trial court found, although Ms. Mangam may have put forth effort to secure the Commonwealth as a tenant of the Property, because she did not testify at trial, "it is unclear what, if anything, she had done or accomplished." . . . "It was Clark's efforts, coupled with Pascotti, that secured the lease with

the Commonwealth of Pennsylvania. Pascotti spoke directly with the Department of Banking for Purposes of negotiating the lease." Findings of Fact and Conclusions of Law, filed 5/29/20, at ¶¶ 24, 39.

Also, the trial court, within its purview as factfinder, found Appellant's actions did not confer a benefit upon Appellees, because Appellant did not negotiate the Lease with Appellees, and the Third and Fourth Amendments thereto, for which Appellant made the claims of unjust enrichment and pertained to expansions to the Commonwealth's square footage, were procured by Mr. Brandeis. In fact, Mr. Mallios admitted that he did not negotiate the Third and Fourth Amendments to the Lease. N.T. Non-Jury Trial, 100-104.

In light of all of the foregoing, we find no trial court error and affirm the Judgment entered on December 22, 2020.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/23/2021

- 23 -